On the 22d day of February, 1871, the plaintiffs filed their bill in the circuit court of the county of Greenbrier, against the defendant. The plaintiffs in their bill allege substantially that on the 13th day of May, 1870, they entered into an article of agreement with the defendant for the formation of a partnership which was known and did business under the firm name of McMahan Co., for the purpose of putting Greenbrier river, or a part thereof, in navigable order for batteaux, extending also down New River so far as the said partners might think proper, and to build and place upon the said river a sufficient number of boats to carry all such freights as might be offered for transportation; that by the said agreement the parties thereto should build a suitable store house, stable and whatever other buildings might be necessary for their work at Greenbrier river, and that the said parties should jointly furnish two or more teams sufficient to transport such freight as might be offered from White Sulphur Springs to the said boats at Greenbrier river bridge. And each of the said parties agreed and bound himself to pay one-third of the money required to complete the work, and to share equally in the profits and losses of the business. All of which will more fully appear from a copy of the said agreement herewith filed and prayed to be taken as part of this bill marked Exhibit A; that in pursuance of the terms of the said agreement, and in the partnership character thereby created, the said firm went on to build a store house and stables, to clean out and improve the river, to build boats, purchase wagons and teams, etc., for the purposes of their business, and that in all *Page 422 
this work, purchases and improvements, they expended a large sum of money, to-wit, the sum of $ ___, and the plaintiffs allege and charge that the said James McClernan never contributed anything whatever to the payment of the said expenses, and never in any way, shape or form put any capital into the said business, as by the said agreement he bound himself to do, but that, in fact, all the said money and capital was furnished by the said Edward McMahon; that the said defendant, James McClernan, was the chief business and managing man of the said firm, and as such, had chief management and control of all its business, and charge and control of its property, received all moneys and disbursed the same, and while the plaintiffs do not know and cannot state the full extent of the transactions of the said firm, they do know and aver that it has done a large and profitable business, and that there has never been a complete and perfect settlement of its business and accounts so as to ascertain the amount of its profits or its losses, so as to distribute the one or sustain the other ratably; that having become dissatisfied with the way in which the business of the said concern was managed and carried on, and being anxious to terminate it and wind it up, they determined to dissolve the said partnership, and, on the 20th inst., proceeded to do so; that the said McClernan was unwilling, and refused to give his consent to the said dissolution, and refused to surrender the property and business, and to enter into a settlement thereof, but still continues to retain and hold possession and management, although, as stated, he has never paid a dollar into the concern; that the plaintiffs believe and charge that the said defendant is wholly and entirely insolvent, and should he dispose of or convert the property belonging to the said partnership, they could have no recourse upon him, but would be greatly and irremediably damaged. They pray that said McClernan be made a party to the bill, and required to answer it fully under oath; that a dissolution of the said partnership, if it be not already an *Page 423 
accomplished fact, may be decreed by the court; that an injunction be granted to prohibit and restrain the said defendant from carrying on further or longer the said partnership business, and that your honor appoint a receiver to take exclusive charge, possession, management and control of the business of the said firm, and of its books, papers of every kind and description, and all its other property of every kind, real and personal, houses, boats, wagons, horses, stables, implements, c.; and that your honor will order and direct the said defendant to give up and surrender all such property and effects of every kind to the said receiver to be appointed; that a decree be rendered by the court, requiring one of its commissioners to take, state and report in full an account of all the transactions and business of the said concern, ascertaining the interest and liability of each of said partners in and to the assets; that they may have such further full and complete relief as comports with equity and good conscience, c. This bill seems to have been verified by the affidavit of said McMahon. The agreement of partnership, mentioned in the bill as Exhibit A is as follows:
"This agreement, made this 13th day of May, 1870, between Edward McMahon, John R. Wills and James McClernan, known and trading under the firm name of the Greenbrier Boat Company.
"It is agreed by all the parties above named to put the Greenbrier river in navigable order for batteaux boats from Greenbrier river, on the James river and Kanawha turnpike road to Graham's Ferry, or such other points extending down New river as they may think proper, and build and to place upon the above named river a sufficient number of boats to carry all and such freights that may be offered for transportation upon the river.
"It is also agreed by the parties to this contract to build a suitable storehouse, stables and whatever buildings necessary for the works at Greenbrier river. *Page 424 
"It is still further agreed, and we bind ourselves jointly, to furnish two or more teams sufficient to transport such freights as may be offered from White Sulphur Springs to the boats at Greenbrier river bridge.
In compliance with the above, we agree and bind ourselves to furnish each one-third of the money required to complete the work, and it is also agreed that each and every party named in this agreement shall be equally interested in the profits and losses of the business.
 [Signed] "EDWARD McMAHON,
 "JOHN R. WILLS,
 "JAMES McCLERNAN."
Either at the time of filing the bill, or very soon thereafter, the plaintiffs procured the Judge of the circuit court to make an order, in these words, viz: "Upon motion of the plaintiffs, and for reasons appearing, it is ordered that E. McMahon be and he is hereby appointed special receiver in this case, with directions to take exclusive charge, possession, management and control of the business of the firm of McMahon Co., and of its books, notes, accounts, papers of every kind and description, and all of its property of every kind, real and personal, houses, boats, wagons, horses, stables, implements, c. And it is further ordered that the said defendant, James McClernan, shall surrender all the property, and effects of every kind, to the said McMahon, receiver as aforesaid. But the said McMahon, before proceeding to act under this order, or to receive any property, shall give bond in the penalty of $15,000, conditioned for the faithful discharge of his duties as such receiver, with security, to be approved by the clerk of this court."
It does not appear by the record that the defendant had any notice of the application for the appointment of a receiver. On the 7th day of March, the plaintiff procured the same Judge to make an order in said cause as follows:
"On motion of the plaintiff, E. McMahon, by his counsel, *Page 425 
it is ordered that this cause be referred to Mark L. Spotts, as special commissioner, who, after giving ten days' notice to the parties to this suit, shall take, state and report an account of the partnership business and transactions of the late firm of McMahon Co., showing the amount of capital paid in and invested by each of the partners, the profits arising or the losses incurred by the said business, the value of the assets of the said firm of any kind, and the interests of the said partners therein respectively — opening the said account as of the date of the formation of the said partnership, and closing it as of the 22d of February, 1871, when the said business was placed in the hands of a receiver.
"And it is further ordered that the said commissioner state and report an account of the transactions of the said E. McMahon, as special receiver, heretofore appointed in this cause, in conducting the business of the said firm of McMahon Co.; and any other matter deemed pertinent by himself or required by either party shall be specially stated. The said commissioner shall make report of his proceedings under this order to the next term of the circcuit court of said county.
 (Enter.) J. M. McWHORTER."
The record does not disclose that the defendant had any notice of the application of the plaintiffs for the making of the last named order. The defendant, McClernan, after the above named orders were made in vacation, and as I infer after the 20th day of March, 1871, (as his affidavit verifying said answer is of that date) filed his answer to the plaintiff's bill as follows:
"To the Hon. J. M. McWhorter, Judge of said court:
"This respondent, reserving the benefit of all proper exceptions to the complainants' bill, demurs to the same, and prays that this, his demurrer, may avail him at the hearing as if the same were more fully pleaded. And for answer this respondent says that it is true that the complainants and himself entered into a partnership for the purposes set forth in the bill, and he and said McMahon *Page 426 
were also partners as agents in the Hazard Powder Company. The complainants have not mentioned this interest in their bill, although they have caused the same to be turned over to the receiver appointed by the court.
"The contract for the Hazard Powder Company was entered into by respondent and Edward McMahon before the complainant, Wills, had any interest in the firm, and was made at that time with a view to the improvement to be made on the Greenbrier river; it then had not been contemplated to take John R. Wills as a partner, but only to secure his services on the improvement to be done on the river. A copy of said contract is here filed marked A.
"The said improvement was first proposed to this respondent early in the spring of 1870, by the complainant, Edward McMahon, who stated that the river would have to be improved, and that the Chesapeake and Ohio railroad company were interested, and he was of the opinion that the company aforesaid would furnish the money. Upon the condition that the railroad company would furnish the necessary funds, and if it would not, then that each partner should furnish his share, your respondent agreed to unite with the complainant, McMahon, in the said improvement; and afterwards, at the request of the said McMahon, John R. Wills was permitted to come in as one of the firm, although it was known at the time that he had no capital to employ. It was the understanding that your respondent should be the active member of the firm, aided by complainant John R. Wills, and the complainant, McMahon, if he failed in getting the funds from the railroad company, was to furnish the funds for himself and said Wills, and respondent to furnish his part. If the funds from the railroad company were furnished, the partners were not expected to have to furnish any, and none have been called for of this respondent. It is true that the agreement or contract of partnership states that each one was to furnish one-third of the money required to complete *Page 427 
the work; this agreement is dated May 13th, 1870; and in his letter of May 30th, 1870, (that is the letter of Edward McMahon, which is herewith filed as a part of this bill, marked P, copied, page 16, as is also his letters of the 18th and 20th of May, marked C and D, copied, page —) he says: `I can get a loan of as much funds as I want, so you will notify John Wills to secure as many good boats as he can get, and to have some more built at the Cowpasture Bridge, or, in other words, you and him go ahead as rapidly as you can, and I will see that you have asmuch funds as is necessary.'
"The meaning and intention of the said agreement was, that each member should be responsible for the return of one-third of the money obtained for the work. On the 12th day of July, 1870, the complainant, McMahon, entered into a contract with the Chesapeake Ohio railroad company, whereby he obtained from said company for the benefit of McMahon Co., $10,000, without interest, for one year. A copy of said contract is herewith filed marked Exhibit E, as a part of this answer. This contract, although made in the name of one of the partners, was made for the benefit of the firm, and the advantages or profits must be divided between each member of the firm, and all that can be required of this respondent is, that if the business and profits of the firm are not sufficient to pay to the railroad company in freights or otherwise as per the contract, by the 12th day of July next, is to advance his portion of the deficiency. At the time of the suing out of the writ enjoining your respondent, the firm of McMahon Co. had charged to the Chesapeake and Ohio railroad company for transportation of freight about $8,500, and long before the 12th day of July, 1871, the whole amount loaned by the Chesapeake and Ohio railroad company to the firm of McMahon Co. will have been paid. This respondent avers that he is in as good condition pecuniarily as he was when he first entered the firm of McMahon Co., and that at the last sitting of the legislature of the *Page 428 
State of West Virginia, it granted your respondent, Edward McMahon and John R. Wills, and their associates, a charter guaranteeing them the exclusive right to improve and navigate Greenbrier river and New river, and he is of the opinion that his interest in this franchise is enough to indemnify his co-partners against any loss they may sustain. The complainants aver that no settlement of the partnership business has ever been made, and, therefore, they cannot tell whether the business has been conducted properly or not. This may be true, but it is not the fault of this respondent; he has always been ready to settle, and the books have always been open to the inspection of each member of the firm, and if they were as fearful of this respondent as they nowpretend to be, they would have known something about the business, and respondent has as much right to complain at their neglect in not attending to the business; and certainly they have no right to complain at their ignorance, when it was their own fault. Complainants do not charge that he has been guilty of any breach of trust, or that there is any endeavor of such intention on his part.
"Respondent avers that he has been faithful in the discharge of his duties, and has at all times had in view the interest of McMahon Co.; that for many months he labored to get the river in such a condition that they could realize some compensation for their services, and that he has now got the same in good working condition, and the company is deriving large profits from his services so rendered, and this consideration has, no doubt, induced the action on the part of the plaintiffs, and soon the business will be largely increased by the letting out of the contracts for the completion of the whole line of the Chesapeake and Ohio railroad.
"Respondent avers that the firm of McMahon Co. was formed for the purpose of carrying freight on the river during the building of said road, and that said partnership cannot be dissolved without good cause until *Page 429 
the object for which the firm was organized has been accomplished; that he has been faithful in all things as a partner, rendering all the service required of him, and misapplying no funds and endangering none. The improvement of the Greenbrier river has been a valuable investment, and this respondent avers that there is no reason for the proceedings had by the complainants, except that the profits divided between two will be greater than to divide the same into three parts, and submit whether that is sufficient to give to the complainants what they pray for in their bill; having fully answered, he prays hence to be dismissed with his proper costs and charges."
The Hazard Powder Company contract referred to in the defendant's answer, is as follows:
"By this agreement, the Hazard Powder Company, of Hazardville, Connecticut, agree to erect a powder magazine at Greenbrier bridge, Western Virginia, and keep it supplied to the best of their ability with blasting powder and safety fuse, paying all expenses and taking all risks of explosion on same while in transit from New York to Greenbrier bridge, W. Va, and while in magazine there, provided proper care be taken of the same. All other expenses to be borne by Messrs. McMahon Co., except carting from White Sulphur Springs railroad depot to the magazine at Greenbrier Bridge, for which they are to receive (10c) ten cents per keg on the powder, and (50c) fifty cents per barrel on the fuse. Messrs. McMahon Co. hereby agree to act as agents for the Hazard Powder Company, and take charge of such powder and fuse as may be consigned to them by the said company, and make sales of same to such contractors on the extension of the Chesapeake and Ohio railroad as they may in their good judgment deem perfectly safe and solvent — Messrs. McMahon Co. to make collection for same, and render a monthly account of sales and returns, for all sold during the month, to the Hazard Powder Company at their office, No. 80 Wallstreet, New *Page 430 
York, who agree to allow Messrs. McMahon Co. for said services (10) ten cents per keg commission on the powder, and (5) five per cent commission on the selling price on fuse. Prices to be governed by the said Hazard Company. The magazine to be used for no other purpose than the storage of powder and fuse, the property of the said Hazard Powder Company. Executed at White Sulphur Springs, West Virginia, this 9th day of April, 1870.
 "THE HAZARD POWDER COMPANY,
 "Per Wm. S. Colvin,
 "EDWARD McMAHON,
 "JAS. McCLERNAN."
Exhibit E, filed with defendant McClernan's answer, is as follows:
"Memorandum of an agreement, made the 12th day of July, 1870, between Major Edward McMahon, of Staunton, Virginia, of the first part, and the Chesapeake and Ohio railroad company, of the second part: The said Edward McMahon, on his part, agrees:
"1st. To improve by sluice navigation, the Greenbrier river from the point at which the road from White Sulphur Springs to Lewisburg crosses it to the point nearest the east end of Great Bend tunnel, and if practicable to the point nearest the west end of said tunnel.
"2d. To improve the navigation of Greenbrier and New river from the point last mentioned to Richmond Falls, if practicable, and if the said railroad company, party of the second part, shall require it.
"3d. To haul all the material the said Chesapeake and Ohio railroad shall desire to have hauled from White Sulphur Springs to the first crossing of the railroad over Greenbrier river, and to points beyond on Greenbrier and New river as far as Richmond Falls, at and for the following rates of compensation for the hauling and delivering of every hundred pounds thereof, viz:
 "1st. To the said first crossing of Greenbrier river, sixty cents. *Page 431 
"2d. To points between said first crossing and the points on the river nearest the west end of Great Bend tunnel, seventy-five cents.
"3d. From said west end to Richmond Falls, and points between, an additional charge per mile equal to the mileage between Greenbrier bridge (turnpike), and the east end of Great Bend tunnel, at fifty cents for the whole distance.
"The Chesapeake and Ohio railroad company on its part agrees to advance to the said Edward McMahon, on the signing of this contract, the sum of $10,000, without interest for one year, to be repaid in freights under this contract, if sufficient within that time, and any balance to be returned at the end of the year — said McMahon to deposit with the company collaterals satisfactory to cover such advance.
It is further agreed by and between the parties, that to secure the proper construction and due performance of this contract, all questions of difference that may arise between the company and the contractor in regard to its promptness of execution, promptness of transportation, and damage by detention or loss, shall be submitted to the arbitrament of the vice president and the chief engineer for the time being of the company, and their decision in all cases shall be final. The said company are to give said McMahon all their hauling from terminus of said road at or beyond White Sulphur Springs, going west of Greenbrier bridge.
"It is further agreed that the goods to be delivered to the company or contractors shall be delivered at such possible landings on the river bank as the company or contractors may designate. And it is further agreed that the rates of transportation for contractors for their supplies shall not exceed the charges herein named for the goods of the company to the west end of Great Bend tunnel and ratably from thence west. Witness the signatures of the said Edward McMahon and of Wm. C. Wickham, vice-president of the said Chesapeake and *Page 432 
Ohio Railroad Company, by authority and on behalf of said company."
This writing seems to have been executed by Wm. C. Wickham, vice-president of the Chesapeake and Ohio railroad only. McMahon does not appear to have signed it. No receipt for collaterals placed in the hands of said railroad company by McMahon appears on the record.
Special commissioner Mark L. Spotts made up his report on the 20th day of April, 1871, in which he says that in the examination of the matters of account connected with the late firm of McMahon Co., "it does not appear that there was any actual capital paid into the concern by the partners. Edward McMahon made an arrangement with the Chesapeake and Ohio railroad company by which said company agreed to furnish him a loan of $10,000 (upon his depositing with the said company certaincollaterals as security for the return of the same, without interestfor one year, which sum was to be repaid to said company in freights, c., at a price agreed upon, if sufficient, within that time, and any balance remaining unpaid to be returned at the end of the year. From the balance sheet taken from the ledger of McMahon Co. it appears that there has been returned to the Chesapeake and Ohio railroad company, in freights, c., the sum of $8,612.50, to be credited on the loan of $10,000. This loan was furnished from time to time by E. McMahon to the concern of Edward McMahon Co. as the improvement of the river progressed, and it is a debatable question with your commissioner whether interest should be charged to and accounted for by the other partners of E. McMahon Co. to E. McMahon. * * * The balance sheet marked F, represents the condition of McMahon Co. as shown by their ledger, and from this statement it will be seen that the amount of credits will about meet all their liabilities, there being a small excess of credits over the debts, say $34.83, with the exception of the river improvement, the cost of which has been estimated at $4,000 or thereabouts; what *Page 433 
remains as assets of the said concern of McMahon Co. is the inventory of goods, horses, wagons, c., agreed upon and signed by the parties, and returned with this report, and amounts to the sum of $7,555.30. From which must be deducted this sum to-wit, $3,173.65; being a portion of some items embraced in this inventory, which had been charged on ledger to stock account. Amount over, $4,381.65. The balance sheet marked F, represents the amount due the Hazard Powder Company as $6,482.06.
A statement will be found, filed in this cause marked H, purporting to have been made out by the clerk of the firm of McMahon Co., and nothing appears among the papers to show it has not been accepted by the Hazard Power Company as a fair exhibit of the state of accounts between the parties which represents the sum of $5,496.15, as the true balance due to said Hazard Powder Company, and if that inference be correct, it will leave the sum to be added to the inventory, $985.91, making a total of $5,367.56.
Assuming that the statement is a true expose of the assets of McMahon Co., and your commissioner has doubts, owing to the condition of the books, c., in the distribution of the above sum of $5,367.56, James McClernan should be charged with the sum of $143.74 being the amount of his account on the ledger, and the further sum of $1,064.28, balance due to cash account (he being cashier) making $1,208.02, as the amount of the indebtness of James McClernan to the firm of Edward McMahon Co., of which firm he was one of the partners and the cashier.
* * The said E. McMahon has not appeared before your commissioner with his accounts as receiver, and he has no material by which he can furnish and report or account in relation thereto." The said commissioner made a brief supplement to his report by which he reduces the said $5,367.56 balance of inventory to $5,239.31. This reduction be arrived at by deducting *Page 434 
$128.25 being cost, as he says, of building erected by and paid for by the Hazard Powder Company, and sample boxes belonging to same.
Several exceptions were filed to this report by the counsel of plaintiffs and one by the counsel of defendant, but it is unnecessary to notice them further under my view of this case. The act of the Legislature referred to in the answer of defendant, McClernan, is as follows:
An act to incorporate the Greenbrier Boating Company, passed February 25, 1871.
Be it enacted by the Legislature of West Virginia: 1st. Edward McMahon, James McClernan and John R. Wills, their associates and successors, are hereby constituted a body politic and corporate by the name and style of "The Greenbrier Boating Company," and as such they are empowered to improve and navigate the Greenbrier and New rivers from the crossing of the former by the James river and Kanawha turnpike to Bowyer's ferry, on the latter river. Said rivers are hereby declared to be public highways.
2. The stock of the said company shall consist of not less than one hundred nor more than five hundred shares of $100 each, and when one hundred shares are subscribed the said company may be organized by the election of three directors to manage the affairs of said company.
3d. The said corporators shall be credited in their subscription of stock with the amount which they have already expended in improving the navigation of the said rivers and in constructing boats.
4th. The said company shall have the right to purchase or lease any real estate that may be necessary for their purposes, and to make such charges for the transportation of freight as may be reasonable.
5th. The said company may demand and receive at such points in said river as may be selected by the directors of the company, such tolls as may be reasonable and approved by the Board of Public Works, not to exceed *Page 435 
fifteen per cent per annum on the net cost of the improvement, including repairs.
I, W. T. Burdett, clerk of the House of Delegates, and as such, keeper of the rolls, hereby certify that the foregoing is a true copy, as appears from the records of my office, of an act passed February 25, 1871, and of chapter one hundred and seventeen of the Acts of 1871.
 W. T. BURDETT,
 Clerk of the House of Delegates and Keeper of the Rolls.
The letters B, C and D, filed by defendant with his answer as exhibits are as follows:
 STRETCHER'S NECK TUNNEL, Monday Morning, May 30, 1870.
 "James McClernan, Lewisburg. W. Va.:
DEAR JAMES: Since I have seen you, I have learned, or have been informed, that I can get alone of as much funds as I want, so you will notify John Wills to secure as many good boats as he can get, and have some more built at the Cowpasture Bridge, or, in other words, you and him go ahead as rapidly as you can, and I will see that you have as much funds as is necessary.
 "Your friend,
 [Signed]"EDWARD McMAHON."
 "RICHMOND, VA., May 21, 1870.
 "Jas. McClernan, W. Va.:
DEAR SIR: — On to-day Gen. Wickham received a letter from Mr. Huntington, the president, making further inquiry about solvency and other things, and I was called upon, and I believe I have satisfied the officers in Richmond. So Gen. Wickham will inform him by tonight's mail, and so soon as he receives an answer, he will write to me. In any event, Mr. Whitcombe promised to give me the boating of all the companies supplies, and from a rough estimate, it will amount to some thirty thousand dollars, so I have purchased all the supplies necessary for the boats, so you had better go ahead with your house; make it 55x35, and if necessary we
 *Page 249