## CHARLESTON.

DORR *v.* DEWING & SONS *et al.*

Submitted January 27, 1892.—Decided April 13, 1892.

1. REVERSAL OF JUDGMENT—REFERENCE.

After a chancery cause has been heard and a final decree pronounced in the court below, without an order of reference in any wise suggested or asked by the appellant, he can not for the first time in the appellate court assign such hearing without such order as error, unless it appears from the record, that manifest injustice has been done him thereby, or that it was the duty of the court of its own motion if necessary, to send the cause to a commissioner before a final hearing.

2. REVERSAL OF JUDGMENT.

When the decree sought to be reversed is based on depositions or other evidence so doubtful, obscure or conflicting as that different judges keeping in mind, where the burden of proof lies, might reasonably disagree as to the facts proved and the proper inferences to be drawn, the appellate court will decline to reverse the finding and decree of the chancellor.

3. REVERSAL OF JUDGMENT.

A case in which the law of agency and partnership is applied.

*W. T. Ice* and *E. D. Talbot* for appellants cited 70 Va. 517, 526 ; 1 W. Va. 125 ; 12 W. Va. 699, 706, 797 ; 4 Munf. 273 ; 9 Leigh 153 ; 26 W. Va. 659 ; 1 Bar. Ch'y. Pr. § 62.

*Brown, Jackson & Knight* for appellee cited 27 W. Va. 639 ; 28 W. Va. 715 ; 29 W. Va. 116 ; 31 W. Va. 516 ; Id.

137 ; 76 Va. 899 ; 1 Bates Partn. §§ 32, 33; 5 W. Va. 377 ; 30 W. Va. 555; 21 Gratt. 189; 30 Gratt. 94; 26 W. Va. 659.

HOLT, JUDGE :

This is a suit in equity brought 7th May, 1889, in Circuit Court of Webster county, by C. P. Dorr, defendant in error, against Dewing & Sons *et al.*, plaintiffs in error.   It is a suit by Dorr, as a general creditor, to enforce payment of his claim against defendants Dewing & Sons, as non-residents, by levy of attachment on certain real estate of theirs situate in the county of the suit and elsewhere in the State. They appeared and made full and vigorous defence.   On 8th November, 1890, the cause came on to be heard on the various papers recited and argument of counsel, when the Court pronounced the final decree now complained of, decreeing that plaintiff recover of the defendants Dewing and Hutton the sum of six thousand dollars, claimed in the bill with interest to date of decree, making, principal and interest, seven thousand and one hundred dollars, and interest thereon from date of decree until paid and costs, and a decree to sell attached lands, or as much as necessary, in default of payment after the ninety days given.

The Dewings appealed and have assigned nine grounds of error, which readily fall under three heads:   (1) defect of necessary parties; (2) error in procedure, in not sending the cause to a commissioner to report facts, in order to a final decree; (3) that the case was for the defendants on the merits on pleadings and proofs.

1. Defect of parties.   It is insisted on behalf of defendants, plaintiffs in error, that, if the partnership, as set up in the bill, was one in fact, though concealed, of Dewing & Sons, ostensibly represented by their agent, Winchester, in the firm of Hutton & Winchester, then the evidence shows, that B. L. Butcher, Esq. was a member of the firm. It may be taken as true, as a general proposition, that, wherever a suit is brought by or against partners, all of them must be joined in the suit, either as plaintiffs or defendants.   To this three answers are given:   *First.* The defendants who raise the objection swear that no such partnership ever existed.   This, of course, is not a complete

answer; for it is a question of law on a given state of facts, about which the result might show that they were mistaken. *Second.* But the more sufficient answer is that the case, as finally developed by the proof, is that Mr. Butcher had ceased to be a partner in the spring of 1887, and the contract fixing the liability on which plaintiff sues was made in October, 1887. And, *third*, this suit may be maintained upon the ground of agency, without regard to the question of partnership, so far as strangers are concerned, especially as Butcher was a silent partner when in the firm of Hutton & Winchester.

2. That there was not a reference to a commissioner is assigned as error in the petition, but is not mentioned or relied on in argument. In a case like this, if the parties could have agreed upon some commissioner acceptable to both, such a reference would certainly have facilitated the examination of the questions of fact; but no reference was asked in any pleading or by motion. Both parties took their proof and submitted the cause to the court for final decision. The court, of its own motion, in order to lighten its own labors, might have well said this mass of conflicting evidence must first go to a commissioner. But for some good reason the court saw fit to go through the whole labor itself; and it comes too late for the party, after he has lost his case, to move for the first time and in the appellate court, that the cause be sent to a commissioner.

3. The chancellor himself with the aid of the learned counsel, has patiently scrutinized and sifted this mass of evidence, and reached the conclusions of fact necessarily at the foundation of the decree he has pronounced; and while his implied finding of necessary facts does not stand upon ground so high as the like finding of a common-law jury or a commissioner in chancery, yet where the decree sought to be reversed is based upon the testimony of witnesses in the form of depositions so conflicting, or from any cause leaving the issues of fact in such a state of doubt and uncertainty, as that, after due consideration of where the burden of proof rests, different judges might reasonably come to different conclusions as to the finding of such issues of fact, the appellate court may and generally should

decline to disturb the finding, express or implied, of the court below. See *Frederick* v. *Frederick*, 31 W. Va. 566 (8 S. E. Rep. 295); *Prichard* v. *Evans*, 31 W. Va. 137 (5 S. E. Rep. 461).

The pleadings are as follows: (1) Plaintiff's bill in chancery, in Foreign attachment levied on the land ordered to be sold by final decree, complained of, and taken for confessed as to defendants Hutton & Winchester, who, being in default, did not appear; (2) answer of W. S. Dewing, James H. Dewing, and Charles A. Dewing, partners under the firm name of Dewing & Sons, and W. S. Dewing in his own right, as answer proper, also made a cross bill alleging new matter, constituting a claim to affirmative relief; (3) the general replication of plaintiff, Dorr, to the answer proper; and (4) special reply in writing to the answer, so far as made a cross bill, with general replication thereto.

Proofs. A large amount of documentary evidence is in the record, brought in as exhibits—about one hundred in all—with the pleadings *pro* and *con*, and as exhibits with the testimony of witnesses, and the testimony of eight witnesses, in form of depositions. The documents speak for themselves, but there is much conflict between the witnesses on some points, yet an outline statement of the case can be made from facts which could not be regarded as called in question effectively before the trial court.

Early in the spring of 1885, A. H. Winchester came to this State from Tennessee to investigate the timber resources of West Virginia, and especially the "Yew Pine Belt," embracing what is known as the "Cheat River Belt," in Tucker, Randolph, and Pocahontas counties, and the "Gauley River Belt," in the counties of Webster, Pocahontas, Nicholas, and Greenbrier, running from the headwaters of Elk south west across the upper eastern waters of Gauley river, as far as Cherry river, an east branch of Gauley river, where the yew pine belt stops.

Winchester came ostensibly on his own behalf, representing no one in any way, but in truth invested by Dewing & Sons, partners doing business at Kalamazoo, as their general agent, with power to carry on the business of buying certain timber lands for his undisclosed and carefully con-

cealed principals, but as their agent, on a salary of twenty five dollars per week.

He looked over the "Cheat country" and the "Gauley country," and then reported in person to his principals in Michigan. He had operated and been implicitly trusted as a timber expert and buyer of timber-lands for about twelve years previous, and had devoted his whole time to the investigation of timber lands, which investigations extended through portions of Canada, Michigan, Kentucky, southwestern Virginia, western North Carolina, Tennessee, Georgia, Alabama, Mississippi and Louisiana. So that his varied experience and opportunities for judging timber and timber-lands seem to have been good.

He reported that, excluding the lands of Senator Davis *et al.*, there were about two hundred thousand acres of yew pine (spruce) land left in the State on the Shaver Fork of Cheat and the Gauley country from Elk to Cherry river. Dewing & Sons desired to secure it all as soon as it could be done quietly at the then low prices, without being known as buyers; to finish buying up the Cheat yew pine country, and then buy up the Gauley country as a whole, as far as possible. Dewing & Sons sent Winchester back with authority in the premises, unlimited in any way—as their *alter ego*, in the disguise of himself—subject, however, to the constant control and direction of his principals.

Here we drop the Cheat purchase as not germane, except occasionally and incidentally, to the matter in hand—except to say now that the purchases by Winchester from May, 1885, to spring of 1888, amount in round numbers to about one hundred and thirty five thousand acres, and that about two hundred and thirty thousand dollars passed through Winchester's hands. Winchester, their agent, represented that there were about one hundred and eighteen thousand acres in the Gauley yew pine belt, including the McNeal tract, of about forty eight thousand acres, and about ——— acres on Shaver's fork of Cheat river, of desirable yew (spruce) pine timber-lands.

On April 3, 1885, Winchester left Kalamazoo, the place of business of Dewing & Sons, on his return trip to the "Cheat" and "Gauley" yew pine belts, with the following

instructions from his principals : "Buy spruce timber lands on Cheat waters as judiciously as possible, keeping Dewing & Sons thoroughly posted as to all moves made, having no rights or powers in the matter that are not subject to change by their orders at any time, and of course without anything being said on the subject, except I am expected to use every effort to advance Dewing & Sons' interest in the matter, and under no circumstances, directly or indirectly, to profit by any trade made.  My salary of twenty five dollars per week to be payable to my wife, being payment in full for my whole time, and any perquisites or emoluments of any kind, growing out of any transactions, to accrue in no case to my benefit, but in all cases to that of Messrs. Dewing & Sons."  This was signed "A. H. Winchester," and is produced in evidence by appellants.

Reaching Randolph county in April, 1885, Winchester, then a stranger to the people and to the title to these pine lands, except that he knew in a general way that there were often conflicting claims, and many of them in dispute and involved in litigation, actual or threatened, found Col. Elihu Hutton, a well known citizen of Randolph, on the ground, engaged in buying and selling lands of this kind and in this region, familiar with the owners, resident and nonresident, the titles and conflict of titles, with options already taken, making, with what he already owned, some twenty thousand or thirty thousand acres of very desirable yew pine timber lands, and at low figures—say, on an average, of one dollar per acre.

For the purpose of getting the lands already owned and held by Hutton, and in order to have his assistance, and especially to take him out of the yew pine belt as a competitor, Winchester proposed to Hutton to engage in a partnership with him, whereby the firm of Hutton & Winchester should buy as low as possible, expecting to pay on an average about one dollar per acre, and in Hutton's name ; Winchester to introduce the buyers, and sell at not less than two dollars per acre, and to provide the funds to pay for these lands ; the profits, after deducting expenses, to be divided equally between them.

To this Hutton assented, and the contract of partnership

was formed.   What Hutton already had by purchase complete and by option were turned over to the firm, and they proceeded at once, and as quietly as possible, to buy—on Cheat first, and then on Gauley—until their purchases amounted to some one hundred and thirty five thousand . acres—about sixty five thousand acres on Sharer's Fork of Cheat river, and sixty five thousand acres on the eastern Gauley waters, extending from Elk to Cherry river, covering pretty much the whole Gauley yew pine belt, except where cut in two by the McNeil tract of forty eight thousand acres on Williams river an upper eastern branch of Gauley, regarded by Winchester and his principals as important for them to obtain; and Hutton & Winchester undertook and tried to buy it from the owners in various ways, leading to their buying up what we may call, judging by the result of the litigation, a previous worthless option on the bonds given for the purchase-money to the McNeil heirs by Hovey and others who had bought; to protracted suits in the various courts, attended with various expenditures, amounting to several thousand dollars, but ending in ultimate defeat and failure, with its attendant losses.

In buying lands on Gauley, they sometimes found that they had to take the whole tract, which, as to those lying along the "divide," frequently ran well down on the Elk river side.   These Elk river lands, Winchester represented that his purchasers did not want, but only what was known as the "Cheat" (Sharer's Fork) and "Gauley" (yew pine) lands; and he and Hutton agreed that Hutton should take at cost price these lands on the "Elk side," in the settlement of the partnership.

Plaintiff, C. P. Dorr, was an attorney and real estate agent of ten years' standing at Webster C. H., long familiar with the "Gauley belt," with the owners, and various conflicting claims and titles, the location, boundaries and the timber and lands themselves.   He also owned himself quite a number of tracts, including some seven thousand acres on the upper Gauley, in the yew pine belt.   In September, 1885, Winchester employed the plaintiff, C. P. Dorr, as attorney and real estate agent, to assist in these

purchases, examine titles, make abstracts, conduct or defend any litigations growing out of these transactions in the Gauley region and to advise and assist continually when needed or called on as such assistant, and as general counsel on the Elk and Gauley side south-west of Tygart's valley. In this employment Dorr continued for some three years, devoting to it a very large part of his time during that period.

There was a verbal contract that the firm would take all Dorr's lands at one dollar per acre, but afterwards Hutton & Winchester decided that they only wanted what lay on the Gauley side of Elk and Gauley watershed or "divide" —the seven thousand acres already mentioned. This came from their purchasers, Dewing & Sons, who did not wish to buy lands on the Elk side.

Dorr had early informed Winchester that he was struggling to convert his wild lands into money, and save and put his means into shape so as to be ready to buy, when the time came, a farm in Pocahontas called "Clover Lick" where his wife was born and raised, and which had been in her family the Warricks, for more than one hundred years. The land was incumbered, and in court for ascertainment and enforcement of liens amounting to some eighteen or twenty thousand dollars. In 1887 Dorr entered into negotiations with his father-in-law for the purchase of "Clover Lick" at ninteen thousand, six hundred dollars, the aggregate amount of liens. On the 15th October, 1887, he went to see Winchester, to ascertain what was coming to him, and what amount of money he had and could raise from that source. Dorr estimated his services at four to five thousand dollars.

When Winchester was examined as a witness, he was asked the question: "Did you or not ever have a settlement with the plaintiff (Dorr) for his said services? If so state when it was, and what, if anything, else was carried into the settlement, and the result of the settlement." Winchester answers: "I had. I think, in October, 1887, Mr. Dorr came to my office at Cheat river bridge, and stated that it seemed very desirable to him that he purchase for himself what was known as the 'Clover Lick' property,

which would cost not more than twenty thousand dollars
and he thought could possibly be bought for about fifteen
thousand dollars, and asked me if I supposed that, with the
credits to which he was then entitled upon my books, he
would have funds sufficient to enable him to do so. We
discussed the state of his affairs in connection with our firm
very minutely and at great length, as to the amount of his
land, of his services and expenses; the discussion running
far into the night.

The next morning, after a long deliberation, finding that
a just accounting at that time would about cover the
amount required to purchase the farm; that his prospective
earnings would be much more—I concluded to make Mr.
Dorr the following offer: That all his holdings of pine
land be transferred to us; that all his services rendered up
to date be considered settled in full; that all his further
services that I might require in the closing up of the busi-
ness then in progress be accorded me in the same manner
as those heretofore rendered; that he give his best endeav-
ors to cutting down the price to be paid for the Clover
Lick property—to obtain it at the lowest possible price;
and that I would pay for it as a set-off in full for the land
and the services. This offer be accepted before leaving the
house, and it was thereafter considered a contract.

I was acting as the representative of Dewing & Sons in
the firm of Hutton & Winchester. The matters settled and
adjusted by this transaction were those of the firm of Hut-
tan & Winchester now (in name) Hutton & Dewing. Per-
sonal or individual interests in the matter, I had none what-
ever. Up to and until after this time I had made no men-
tion to Dorr of my principal, and such concealment was a
part of the policy agreed upon between myself and Dewing
& Sons.

The land owned by Dorr individually, settled for in this
settlement, aggregated about seven thousand acres, and
the price allowed for the land was two dollars per acre.
We were paying, if necessary, two dollars per acre for land.
In making my mental calculations, I considered these (lands)
well worth that figure, and should consider myself whole if
it had required that estimate to cover the purchase of the

'Clover Lick' property, and that what was tangible and in sight made it about even, and that, in case of the success of the McNeil suits, it would make it a very desirable bargain for our firm. This settlement, like all my other transactions, was meant to be advantageous to my principals, and I think the results proved it to be a good trade.

After making this settlement, on October 15, 1887, I immediately saddled up my horse and rode over to Col. Hutton's, explaining to him what I had done. I told him I had to act quick, and asked him if he thought I made a good trade. He said, 'In case we win the McNeil suit, it is a big bargain;' otherwise, we wouldn't be much ahead."

In a letter of Winchester to Dewing & Sons, of 18th November, 1887, he says: "Everything is too crude yet to get ideas in definite shape, but I think I can almost promise the delays in the payments that we discussed, as all my correspondence looks favorable, except as to what is going to Dorr, which he expected no use for." * * * "An old ante-war suit that has dragged along against his father-in-law has, contrary to expectations, gone against him at last court, and Dorr will have to pull him through."

Dewing & Sons, by letter of November 25, 1887, to Winchester, say: "When you settle with Dorr, you can arrange it to help him out by paying his debts now that he must pay, but you may not be obliged to pay them all cash down. We would like to have you know when Dorr wants money and would rather pay him when he must have it than give him time acceptances."

Again Winchester, writing to Dewing & Sons by letter of February 20, 1888, says, among other things: "Dorr has not had the cash his accounts indicate. We purchased his own individual holdings in Sept. 1885, for cash, and explaining that, while he could have it at any time, we were making such large payments that we wished it to run until the last moment, he always explaining that all he cared for was to be perfectly secured; that, in case a certain suit went against his father-in-law for the possession of a tract of land at Clover Lick, he would have it in time to save it by purchase. This suit was lost in Oct., and he has strung his cash on, until now, the two three thousand dollar and

two two thousand dollar drafts being all he has ever had for his own use; the balance going through him to others. Of course, this did not make it any the easier to raise the money, but I wanted to show that we had kept your admonitions and our promises in mind in easing things off as well as we can."

Under this agreement, Dorr bought up many of the liens against "Clover Lick" at a discount, and thus reduced the actual cost of the farm to fifteen thousand dollars; Winchester furnishing the money as follows: 8th November, 1887, three thousand dollars; 12th November, 1887, three thousand dollars; February 1888, two thousand dollars; and February, 1888, two thousand dollars, one thousand dollars of which is shown to have been used in paying on land for Winchester—making in all nine thousand dollars; leaving a balance of six thousand dollars with interest. And for this sum of six thousand dollars and interest the court pronounced, in favor of plaintiff, Dorr, the decree complained of.

The evidence of plaintiff, Dorr, is to the same effect. Col. Hutton, the other partner, is not examined as a witness, but the bill is taken for confessed as to him. W. S. Dewing, in his deposition as well as in the answer, flatly contradicts Dorr and Winchester on these turning points.

This record contains well nigh six hundred pages, largely made up of the correspondence between Winchester and Dewing & Sons, back and forth, while these transactions were going on. In this conflict, I naturally turned to them, and gave them a minute and careful examination, knowing that in them I would be likely to find something more reliable and trustworthy than the "uncertain, slippery memory of man."

They fully and completely, in all essential points, sustain the testimony of Winchester, and furnished to the court below a safe and trustworthy foundation for its decree in this behalf;—that Winchester was acting as the agent of Dewing & Sons, formed the relation which we may call for the present a partnership with Hutton, employed Dorr as their attorney, bought his land, settled with him as stated; all with the knowledge and ratification and approval of his

principals, Dewing & Sons. In fact, taking all the evidence together, we must conclude that when Dewing & Sons, no longer needing it, or being unable further to maintain it, came forward and threw off the disguise, and in the person of William S. Dewing, one of the firm, took with Hutton their real though concealed relation as his partner, in the room and stead of their agent, Winchester, the firm name being now Hutton & Dewing, they executed a paper called "Exhibit B," with the bill dated 16th November, 1888, saying, among other things: "Said William S. Dewing agrees to take the place of said Winchester in the matter of the purchase of what are known as the 'Gauley Lands,' and to carry out all agreements, contracts and understandings as to said purchases in good faith, as in the original intent they were designed between said Hutton and Winchester." Signed by Dewing and Hutton, and in separate indorsement by Winchester.

I need not go into this curious relation which existed between Dewing & Sons and Hutton by reason of the formation, with their knowledge and consent, of this partnership of Hutton & Winchester. The scope of the business was to buy and sell timber lands; and partners, in their dealings with each other, are expected and required to use towards each other the most scrupulous good faith. Having united in this common enterprise, each, as principal, entitled to his share of the social profits, if any, and each the agent of the firm, the firm, both in its collective and individual capacity, is bound by the acts of the members, acting within the scope of the business. But I need not discuss this subject further, as this decree can well stand upon the doctrine of agency alone, as applied to the pleadings and the proof.

Appellants assign as error that the court required Dorr to discover under oath the aggregate amount of money received by him as attorney and agent, directly or indirectly, from appellants, or from A. H. Winchester as their agent, and what disposition he had made of the same, as prayed in their answer by way of cross-bill. The record does show that this was done. Dorr in his special replication to the cross-bill rendered under oath an itemized ac-

count of all such moneys, and showed by evidence how it had been disbursed in the interest of and as directed by Hutton & Winchester; and appellants did not attempt to controvert it, but contented themselves with resisting a balance thus shown on that account to be due to plaintiff, though such rendering and settlement of his account as attorney was had and made at their instance.

As to the "Porter Lands" sold by Winchester or Hutton, the evidence shows that Dorr received none of the proceeds of sale, which was at a profit of some fifteen thousand dollars.

As to the transactions in what is called the "McNeil Land Suits," the evidence shows that Dorr was employed and acted solely as the agent and attorney of Hutton & Winchester, and with the knowledge and approval of appellants, in a general way, without knowing, perhaps, the details, or all the means resorted to.

The next and last error assigned in the order here considered relates to what is called the "Powell Mountain Land," about eight thousand acres, bought by Dorr at a sale made by Craig, commissioner of school lands of Nicholas county, for Winchester, with funds furnished in part by Winchester and in part by himself.

Plaintiff, Dorr, in his answer to the cross-bill, says that if Dewing & Sons wish to repudiate this purchase, and return to him the lands, he will take them, and pay them the amount of money so furnished by Winchester.

On this head, it is sufficient to say that appellants repudiate having any interest in the "Powell Mountain Land," except under a trust-deed from Hutton. Dorr was to convey as Winchester directed, and his principals, Dewing & Sons, declined to accept the purchase made in behalf of Hutton & Winchester. Neither would the pleadings justify a decree for any such conveyance to appellants. Therefore the respective rights of the parties in and to what are in the proceedings called the "Powell Mountain Lands" must be left without prejudice; but this is not in any wise to affect the judgment and decree of the court below upon the settlement of appellee's account, as rendered by him, in answer to the prayer of appellants in their answer pray-

ing affirmative relief. The decree complained of, as thus modified, is in all respects affirmed, with costs to the appellee.

MODIFIED AND AFFIRMED.