# CHARLESTON.

KREBS v. BLANKENSHIP *et al.*

Submitted January 6, 1914.   Decided January 27, 1914.

1. PARTNERSHIP—*Agreement Between Partners—Construction.*

  By a contract in writing, K and B agreed "to option coal and timber lands" and to secure when necessary renewals of options, K to furnish the "option money" to offset the services of B in securing the options and renewals, and "in case of a sale of the property under option or what may be optioned" to divide the profits equally between them "less option money". Each of them was thereby authorized "to sell the property under option and to do all' in his power to negotiate such sale". *Held:* That K and B thereby became partners for the purposes stated; that, when properly construed according to its terms alone or by its terms and the conduct of the partners, the contract authorized dealings in lands optioned, as well as in the instruments under which they thus controlled the lands. (p. 541).

2. SAME—*Partners—Dual Relation—Secret Dealings—Accounting.*

  A partner occupies a dual relation in respect of his dealings with his associates and with the partnership assets. As to the former, he is a trustee; as to the latter, a *cestui que trust*. Out of this dual relation arises the reciprocal duty by which each partner is required to refrain from all concealment in his transactions with his co-

partners and with the common property; and if, by fraud or concealment, he derives a benefit to the exclusion of his associates, equity will treat him as a trustee of the firm, and compel him to account therefor. (p. 545).

3. SAME—*Dealings Between Partners—Good Faith.*

Partners in their dealings with each other are required to use the utmost good faith. If either of them seeks to acquire the interest of another, he must make to him a frank and honest disclosure of all knowledge possessed by him from which his associate may form a sound judgment as to the value of such interest. (p. 545).

4. SAME—*Dealings Between Partners—Equitable Relief.*

If, without a full disclosure of all knowledge within his exclusive possession, one partner, by the purchase of his copartner's interest, secures an unfair and inequitable advantage, he commits a breach of faith, from the effect of which equity will grant relief at the suit of the injured partner. (p. 545).

5. SAME—*Termination—Secret Profit.*

A partner can not terminate the partnership relation in order to secure to himself a profit from a sale secretly effected by him of the community property, unless he makes a full, frank and honest disclosure of all the facts and circumstances from which his copartners may form a sound judgment as to the purpose and propriety of such dissolution. (p. 545).

6. SAME—*Secret Profits—Accounting.*

If to the firm property a pretended right is fraudulently obtained by one partner, who, thereafter, with it as a nucleus, secretly secures other like property, and, by a sale of all of it, derives a profit, he will, at the suit of his copartner, thus defrauded, be required to account to the latter for his proportionate share. (p. 545).

Appeal from Circuit Court, Raleigh County.

Bill by George R. Krebs against P. L. Blankenship and others. From decree for defendants, plaintiff appeals.

*Reversed and Remanded.*

*Brown, Jackson & Knight,* for appellants.

*Sanders & Crockett,* for appellees.

LYNCH, JUDGE:

Upon final hearing on pleadings and proof, the circuit court dismissed the bill of George R. Krebs, by which he sought a decree requiring P. L. Blankenship to pay to him a share of the profits derived, as charged by the bill, from the sale of

certain lands in which Krebs and Blankenship were interested as partners. From the decree of dissmissal Krebs has appealed to this court.

On May 29, 1909, Krebs and Blankenship entered into an agreement "to option coal and timber lands" and to secure renewals of options when necessary, Krebs to furnish the "option money" to "offset the services" of Blankenship in securing the options and renewals. In case of a sale of the property under option "or what may be optioned", they were to divide the profits equally, one-half to each, less "option money". Each of them was thereby authorized to sell the property under option and to do all in his power to negotiate such sale.

This agreement is properly construed by the parties as constituting a partnership between Krebs and Blankenship. They differ only as to the scope of the dealings within its terms, Blankenship contending that the firm can not deal as partners in the property optioned, though they may deal in options. This distinction is not warranted by the terms of the agreement. In fact, it is not seriously urged. The contract speaks of the "property under option or what may be optioned", and gives to each partner authority "to sell the property under option". Besides, in the course of the joint dealings, the partners construed the terms as comprehending lands, and not merely the instruments under which they controlled the lands.

At the date of the agreement, Blankenship had options on 2100 acres of coal and timber lands in Mercer county,—the Davis-Smith-Maitland 1100 acres, that is, a boundary in which the three persons named had interests, and the Karnes 1000 acres. Although the options themselves bear a subsequent date, these are the tracts in contemplation as a nucleus of a larger acreage at the inception of the joint dealings, whether in fact under their joint control at that time or later. This fact is conceded; at least it is affirmed by Krebs and not satisfactorily denied by Blankenship.

After agreeing among themselves upon the location of the territory to which the joint dealings should be confined, Blankenship acquired in his own name options on other lands,

thereby increasing the quantity controlled by the firm to 3300 acres. On September 23, 1909, he sold the entire boundary to A. D. Harrah, at the rate of fifty dollars per acre, the exact quantity to be ascertained by survey.

Of this sale Krebs was not advised, as claimed by him, until a short time before the institution of this suit—August, 1910. Blankenship admits he did not at any time inform Krebs of the sale or the contract in pursuance of which it was made, but insists that he knew of its final consummation in February, 1910, and that, with such knowledge, he adjusted by settlement between the parties all matters incident to the partnership transactions.

Blankenship, through Bolen as his agent, on October 14, 1909, purchased Krebs' interest in the options on lands owned by Karnes and others, in which, for purposes hereafter explained, Blankenship previously pretended to assign his interest to Krebs, although he in fact still retained a half interest, being the only interest he really had therein prior to his assignment. As an inducement, Bolen informed Krebs that he had a purchaser, whose name he declined to disclose, who would buy the firm property, but would not pay the consideration theretofore named by the partners. Krebs declined to deal with Bolen at that time, because, as conceded, he had given to one Anderson an option to buy the lands at the rate of fifty-five dollars per acre. At the expiration of the Anderson option, Bolen renewed the effort to deal with Krebs, and again failed. But later he and Blankenship together succeeded in persuading Krebs to assign his interest to Bolen, provided Bolen's purchaser accepted the property. If he did accept, the purchaser thus secured was to execute a note for $5000 to each of the partners, Blankenship agreeing at the same time to assign to Bolen his interest upon the same terms and conditions; and the notes were later executed by Bolen, and not by his purchaser. For his service in effecting the assignment of Krebs' interest, Bolen was paid $1000 by Blankenship, or, what is the same in effect, Blankenship offered to pay $6000 for Krebs' interest, with tht understanding that if Bolen secured the interest for less he was to have the difference.

The terms of the agreement thus made by Krebs, Blankenship and Bolen were by Krebs' letter communicated to the law firm of Woods & Martin, to be put in proper legal form, with the understanding that both Krebs and Blankenship should sign it. But Woods by letter informed Krebs that it was not necessary for Blankenship to execute the paper, because he was protected by some arrangement, not stated, between him and Bolen, and Krebs accordingly executed and returned to Woods the assignment of his interest in the lands.

The acquisition of Krebs' interest, as clearly appears, in fact admitted by Blankenship and Bolen, was for the sole use and benefit of Blankenship, who was Bolen's undisclosed purchaser; for, as soon as Bolen obtained the assignment from Krebs and the pretended assignment from Blankenship, he at once re-assigned to the latter the interests of both partners.

The intervention of Bolen being thus far successful, Blankenship further enlisted his services in securing, first, a reduction in the $5,000 note due Krebs under the Bolen assignment to $4,500, and, second, the exchange of the note, when thus reduced, for stocks owned by Blankenship in the New River Coal Company, the value of which was gradually decreasing; in each of which transactions Bolen was also successful. The first he accomplished by inducing Krebs to believe that the purchaser secured by him, but whose name he did not reveal, and who, as stated, was Blankenship, declined to accept 500 acres of the boundary the sale of which he had secured, because of some defect in the title; and the second, by repeated efforts by himself personally and by other influences under his direction, to impress upon Krebs the importance of the coal company stock as a profitable investment.

The contract of sale between Blankenship and Harrah, the existence of which Blankenship at no time disclosed to his copartner, and of which the latter had no knowledge, was finally consummated by deed from Blankenship and wife to Harrah dated February 7, 1910.

Thus, in the order of their dates, it appears, first, that on May 29, 1909, Krebs and Blankenship became partners, and thereby assumed the obligations imposed by law upon those

thus associated; second, that on September 23, 1909, after securing joint control of 3300 acres of coal and timber lands on behalf of the joint enterprise, without notice or information then or later to his associate, Blankenship entered into a secret sale, by means of which when finally consummated he sought to obtain and appropriate to his own use large profits, to the exclusion of Krebs; third, that on October 14, 1909, through an agent who declined to disclose his principal, he purchased the interest of his associate, who had no knowledge of the sale of the partnership property; fourth, that subsequently the same partner, by the same agency, secured a material reduction in the note for the interest of the associate, and its assignment thereafter to Blankenship in exchange for stock, which was in effect only another method for the payment of Blankenship's own note for that amount; and, fifth, the secret and final consummation on February 7, 1910, of the clandestine agreement of sale of the partnership property entered into between Blankenship and Harrah on September 23, 1909.

These are the transactions of which Krebs complains, and the cancellation of which he seeks by his bill, because procured by fraud and deception practiced by his associate and by Bolen acting for him.

Were these transactions fraudulent? As early as *McMahon* v. *McClernan,* 10 W. Va. 419, this court said: "It is a violation of good faith for any partner to stipulate clandestinely with third persons for any private and selfish advantage and benefit to himself exclusive of the partnership; for all the partnership property and contracts should be managed for the equal benefit of all partners according to their respective interests and shares therein. If, therefore, any one partner should so stipulate clandestinely for any private advantage or benefit of himself, to the disadvantage or in fraud of his partners, he will, in equity, be compelled to divide such gains with them".

The same doctrine is enunciated in the later decisions of this court, in those of other states, and in the text-books discussing the obligations of partners in their dealings with each other and with the common property. *Dorr* v. *Dewing,* 36

73 W. Va.

W. Va. 466, 477·; *McKinley* v. *Lynch,* 58 W. Va. 44*; Thorne*
v. *Brown,* 63 W. Va. 603; *Fouse* v. *Shelley,* 64 W. Va. 425;
*Yost* v. *Critcher,* 112 Va. 870; *Miller* v. *Ferguson,* 107 Va.
249; *White* v. *Jouett,* 147 Ky. 197, 205; 30 Cyc. 438, 454.

Each partner occupies a dual relation: he is a trustee in
respect to his dealings with the firm assets, and a *cestui que
trust* in respect to the dealings of his copartner with the
assets. Out of this dual relation arises the reciprocal duty on
the part of all the partners to refrain from all concealment
in their transactions affecting the community interests; and
if any one or more of them, by fraud or concealment, derive
a benefit to the exclusion of his associates, equity will treat
the offender as a trustee for the firm and compel him to account
to it. *McKinley* v. *Lynch, supra,*

As said in *Dorr* v. *Dewing, supra,* "partners in their deal-
ings with each other are expected and required to use the
most scrupulous good faith"—a rule which, according to the
facts of this case, Blankenship sedulously ignored, not only
in the consummation of the contract with Harrah, but also in
his dealings with Krebs. He designedly withheld from the
latter any knowledge whatever of the sale of the social assets
to Harrah, for the plainly manifest purpose of acquiring large
profits, to the equally manifest prejudice of Krebs. Without
such concealment and duplicity, it may reasonably be inferred,
in view of the circumstances appearing in the record, he could
not thus have secured the interests of his copartner. "One
partner must make a frank and honest disclosure to another
of all knowledge from which a sound judgment may be form-
ed as to the value of an interest acquired by the former from
the latter." *Yost* v. *Critcher, supra.* Where a partner at-
tempts unfairly to acquire a gain at the expense of his co-
partner, he commits a breach of faith, for which the law gives
an action to the defrauded partner. *White* v. *Jouett,* 147
Ky. 197. A partner can not obtain a private advantage to
the prejudice of his copartners. He is bound in all transac-
tions affecting the partnership to do his best for the common
body, and to share with his copartners any benefit which he
may have been able to obtain from other people and in which
the firm is, in honor and conscience, entitled to participate.

2 Lindley on Partn. 572; 30 Cyc. 438, 454; Story on Partn. 174, 178; *Mitchell* v. *Reed,* 61 N. Y. 125; *Kimberly* v. *Arms,* 129 U. S. 512; *Henson* v. *Burns,* 41 S. W. 494.

To exonerate himself from Bolen's statements to Krebs, Blankenship says he did not authorize Bolen as agent to mislead or deceive Krebs. But the liability of a principal for the fraud of his agent, acting within the apparent scope of his authority, is now generally recognized. Clark & Skyles on Agency §507; *Travis* v. *Claiborne,* 5 Munf. 438; *Bank* v. *Furniture Co.,* 57 W. Va. 625.

But Blankenship attempts to extricate himself from the effects of the conduct imputed to him, and in the main admitted by him, on the ground that he and Krebs adjusted all matters between them subsequent· to February 7, 1910, the date of the conveyance to Harrah, at which time Krebs, as he contends, had knowledge of that conveyance. But he admits that the settlement included, and that he and Krebs discussed, only the matters relating to the note which Bolen's purchaser was to execute to Krebs but which Bolen in fact did execute, and the assignment by Blankenship to Krebs of the New River Company stock in exchange for that note. While Krebs admits he saw in the Raleigh Register a flamboyant headline, announcing a sale by Blankenship to Harrah of a large acreage of real estate from which large profits would accrue to Blankenship, he denies that he then knew or had any information that the sale so announced was effected through Blankenship's contract with Harrah made September 23, 1909. Even at the settlement on which Blankenship relies, the latter refused to confirm the newspaper article, though asked by Krebs if it were true. He did not then or subsequently advise Krebs that the sale stated by the Register was made in pursuance of such contract. It is true Bolen confirmed the sale at that time, but Blankenship was unwilling even then to admit it. Under these circumstances, Blankenship can not, with any reasonable degree of propriety, urge this settlement in exoneration of and as an excuse for his conduct towards his copartner.

Nor do the facts detailed, even if admitted, warrant application of the doctrine of estoppel, as Blankenship claims; be-

cause he suffered no injury, and did not change his situation to his prejudice, both of which are essential in order to effect an estoppel.   To bind one by estoppel from conduct, he must have reasonable ground to anticipate that another will change his position, or in some way act on the faith of it to his detriment, or alter his position to his prejudice.   *Mullins* v. *Shrewsbury,* 60 W. Va. 694; *Terry* v. *McCluna,* 104 Va. 599.   Again, Blankenship relies on statements by Krebs to witnesses examined on behalf of the defendant, to the effect that Krebs knew Blankenship conveyed the lands to Harrah pursuant to the terms of the September agreement, and stated that he was satisfied with the amount he received out of the transaction. These statements Krebs denies.   That he did not know of the Harrah contract by his partner is substantially proved. Blankenship admits he did not give him any information touching it, and that the contract itself bound him and Harrah to secrecy—an obligation sedulously observed, so far as otherwise appears from the record.   The purpose of the secrecy thus enjoined, both the contracting parties seek to explain by saying that if the contract had been known the effort to increase the acreage and obtain rights of way at a reasonable price would have been defeated.   But, even if this were the real purpose, it did not excuse Blankenship in withholding information from his copartner.   He can not, by contract with a third person, exonerate himself from the discharge of the legal obligations due his associate.

Blankenship further contends that Krebs' participation in the profits accruing from the sale to Harrah, if allowable under any view of the case as presented, is limited to the acreage controlled by the firm on August 21, 1909, when Blankenship claims to have assigned his interest to Krebs; or, at least, by the acreage held by the firm on October 14, 1909, when both partners assigned their interests to Bolen under the conditions heretofore detailed; and that Krebs is not entitled to share in the profits realized on any lands subsequently optioned by Blankenship and included in the deed to Harrah.   It is true that on the former date Blankenship pretended to be solicitous about the prospects of a sale of the property under the firm's control, and of the firm's ability to renew certain options the

time limit of which was then about to expire, but he declined to assume the liability incident to the acceptance of the property, lest he should thereby injuriously affect his credit and endanger his solvency. But Krebs assured him of his willingness to assume the liability, because, as he did not own much property, he could not be seriously endangered. Blankenship, however, did in fact advance one-half of the funds necessary for that purpose, when Krebs indicated his willingness to bear the whole burden, and whereby they saved for the firm, as Krebs evidently understood, the property on which the option limit was about to expire. But it is apparent that this acceptance was not for the purpose of terminating the relation then existing between Krebs and Blankenship, as claimed by the latter, but that it was, on the contrary, in furtherance of the partnership purposes and interests. This transaction, therefore, can not be deemed a consent by either of them to a termination of the relation.

But Blankenship seeks to enforce the view that this transaction did have that effect, and that the partners so treated it; because, as he claims, neither of them thereafter did anything to promote the joint enterprise, and therefore treated the relation as terminated. However, the only reason upon which to base that assumption is that subsequent to the transaction Krebs did not advance any further funds with which to secure either original or renewal options. But he says he was not requested to make further advancements, and in fact that he did not know other advancements were required, but that he was during that time ready and willing to furnish whatever money was necessary for either of these purposes.

Again, that act can not properly be construed as a dissolution of the firm, unless it was understood and agreed that it should have that effect, of which there is no proof. Scrupulous observance of his duties and legal obligations to his partner required Blankenship to inform Krebs that he, Blankenship, construed the August transactions as finally terminating the relation theretofore existing between them, before he undertook to effect a sale to Harrah of the coal and coal lands in which both he and Krebs were jointly interested, under negotiations begun within less than a month subsequent to

August 21st, which culminated in the contract of September 23rd. In view of the authorities cited, that was his reasonable duty, and one the violation of which can not now enure to his benefit.

Nor is Blankenship's contention in respect to the effect of the transaction on October 14, 1909, tenable either on reason or authority. On reason, because it is against every reasonable presumption that had Krebs known of the sale of the partnership property to Harrah he would have assented to engage in any transaction prejudicial to his interests subsequent to that date. In fact, Blankenship's contention is contrary to every such presumption.

The authorities hold that, where one partner enters into a contract without the knowledge of his copartner, in order to secure an advantage from the enjoyment of which he attempts to exclude his partner, by a pretended termination of the partnership relation, the court will declare the transaction a breach of the duty imposed by law whereby each partner is required to act in the utmost good faith toward his associate; and that the offending partner will be charged with relation to his contract as trustee of the firm. Or, conceding his action in the dissolution of the partnership to have been effective, the court will still require him to respond in damages to the complainant, the damages to be measured by the profits realized on the contract. *Williamson* v. *Monroe,* 101 Fed. 322. If a partner secures in his own name a contract which his legal obligation to his copartner required him to take in the partnership name, without disclosing sufficient and satisfactory reasons therefor, or for any other reason affecting his copartner which he did not fully disclose to the latter, equity will decree such contract to have been taken on behalf of and for the benefit of the partnership. *Miller* v. *O'Boyle,* 89 Fed. 140. If in a joint enterprise to buy, improve, sell and convey lands one of the several persons interested, acting on information received pending and by reason of the partnership relations, forms the purpose to purchase and secretly does purchase the same property, and thereby derives a profit, he will be required in equity to account therefor to his partner. *Edwards* v. *Johnson,* 90 S. C. 90. After defin-

ing the duties devolving upon partners in their relations to each other and to the firm, Story on Partnership, §173, says: "Every known deviation from and every excess in the exercise of such rights, powers, authorities and acts, which produce any loss or injury to the partnership, to that extent are to be borne by the partner who occasions the loss or injury; he is bound to indemnify the other partners therefor." See also *McMahon* v. *McClernan, supra.* Though a partnership may terminate, either by the expiration of the time limit fixed therefor or by acts of the copartners, the members are not thereby absolved from liability or discharged from the duties imposed upon them by virtue of that relation. These liabilities and duties continue until a final adjustment and settlement of the partnership affairs is had. *Filbrun* v. *Ivers,* 92 Mo. 388. The court holds, in *Kilborn* v. *Latta,* 5 Mack. 504, 60 Am. Rep. 577, that a partner who secretly receives profits out of a transaction which ought to have been a partnership transaction violates the trust relation, and therefore should account to the firm for the profits thus realized by him. 30 Cyc. 454.

There is also another feature of these dealings which seems to indicate a purpose to obscure, if not prevent the ascertainment of, the exact amount of profits to accrue from the sale to Harrah. While the contract is for a sale and purchase of 3300 acres, it implies an acreage in excess of that quantity, but not at any definite price per acre payable to Blankenship. He agreed to assist Harrah "in securing any adjacent property he may want", for which he "is to be paid his expenses and a reasonable amount for his time, for such work." Blankenship's deed to Harrah, however, conveys 4543.1 acres, in consideration of $227,155, an exact multiple of the quantity conveyed by the rate per acre stated as consideration for the 3300 acres. Wherefore, the conclusion is warranted that Blankenship did not limit his services to assistance in the acquisition of the excess acreage for which, according to the express terms of the Harrah contract, he was to receive expenses and a reasonable compensation, but that he became the real purchaser and the real grantor of the excess, either under cover of the clause quoted or by a new agreement in

lieu of that clause, or by a construction thereof previously understood between him and Harrah, for a purpose readily explainable in view of the transactions heretofore detailed. What profits Blankenship received from the excess acreage depends, of course, on the amount paid by him to those from whom he purchased. This sum so paid is perhaps ascertainable, and should be ascertained, from the record as it now stands. Whether the record discloses facts sufficient for the purpose of a reasonably accurate ascertainment of the profits thus accruing, if any, we have made no effort to determine; because, in any event, in view of what has been said, the case must be remanded for the settlement of all the partnership accounts, including the profits on the entire acreage conveyed to Harrah, provided Blankenship received profits in excess of a reasonable compensation and expenses on the quantity of land conveyed above 3300 acres, Krebs to account for the money or its equivalent received by him from Bolen and Blankenship.

We therefore reverse the decree of the circuit court entered December 7, 1911, cancel the assignments by Krebs to Bolen and by Bolen to Blankenship, and remand the cause for further proceedings therein according to the principles herein announced and otherwise according to the principles governing courts of equity.

*Reversed and Remanded.*