# CHARLESTON

## WETZEL v. JONES.

Submitted November 10, 1914.　Decided December 15. 1914.

1. MINES AND MINERALS—*"Mining Partnership"—Joint Owners of Oil and Gas Lease.*

     Where joint owners of an oil and gas lease unite in operating the demised premises thereunder, without any special agreement as to the character of their relation to each other, they constitute a mining partnership. (p. 274).

2. SAME—*Mining Partnership—Termination—Deed of Trust to Copartners.*

     A mining partnership is not terminated by the execution by one partner of a deed of trust on his interest in the social property to secure to his copartner payment of a note executed to him in a transaction separate and distinct from the firm business. (p. 274).

3. SAME—*Sale of Partnership Interest—Purchase by Copartner.*

     The partner so secured can not buy the interest covered by the trust, at a sale by the trustee thereunder, unless in so doing he exercise toward his copartner the utmost good faith, frankness and fair dealing. (p. 274).

4. SAME—*Mining Partnership—Deed of Trust—Sale—Purchase by Copartner—Ground for Setting Aside Sale.*

     Where the evidence tends strongly to establish other circumstances of unfairness or a fraudulent design by the beneficiary under the trust to acquire his partner's interest thereby granted, a purchase thereof by him at a sale by the trustee will be set aside where the price paid is grossly disproportionate to the actual value of the property. (p. 274).

Appeal from Circuit Court, Ritchie County.

Action by William Wetzel against J. N. Jones and others. From judgment for defendants, plaintiff appeals.

*Reversed in part. Affirmed in part. Remanded.*

*J. W. Vandervort* and *R. E. Bills,* for appellant.

*J. N. Jones* and *Robinson & Prunty,* for appellees.

LYNCH, JUDGE:

As partners, William Wetzel and J. N. Jones, some time prior to September 12, 1910, conducted drilling operations for

the production of oil and gas in Ritchie and other counties of this state. They then were also joint owners in their own right of oil and gas leases on various tracts of land located in the same county, among them being lands of John Denning, on which they had drilled a paying gas well, the lands of R. R. Jones and others. The production of the Denning well they sold to the Mountain State Gas Company, and it to the Hope Natural Gas Company. Having arranged to leave for South America on that day, Wetzel executed his note for $300 at three months, payable to Jones at the Citizens National Bank of Pennsboro, and, to secure its payment when due, gave a deed of trust on the Denning well and fixtures, including tubing and casing, C. H. Broadwater being named trustee. The note having matured on December 12 and remaining unpaid, Jones caused the trustee to advertise the property for sale, and at the sale purchased it for $440, and promptly thereafter procured a deed therefor and its recordation. The other leases, held by them under the firm name, Jones & Wetzel, either had previously lapsed because of non-compliance with their terms, or Jones thereafter permitted them to lapse and took new leases on the same tracts in his own name. Jones' purchase at the trust sale, and the procurement of the leases, were for his sole benefit.

To set aside and annul the sale to Jones, to cancel the deed to him by the trustee, and to have decreed to him an interest in the renewed leases, are the objects sought by Wetzel, but which the lower court denied, and he has appealed.

As to the irregularities relied on as vitiating the sale, we are unable to perceive in what respect Wetzel was prejudiced. Of these one is that, though the grant was in trust to *H. C.* Broadwater, the notice of sale was given, the sale made and deed executed by *C. H.* Broadwater, trustee. The transposition of initials evidently resulted from inadvertence on the part of the scrivener in preparing the deed, there being no proof or suggestion of the existence of any other person, or of an intention to select any person other than C. H. Broadwater as trustee. The other irregularity urged is that Broadwater was not present at the time and place first named in the sale notice, when because of his inability by reason of illness to

attend the sale was postponed two weeks, notice thereof being published and posted together with the original, at which time the property was sold, Broadwater then personally superintending the sale.

The questions vitally affecting the validity and propriety of the sale under the trust and the purchase by Jones are whether there was such fiduciary or trust relation incident to the partnership which, viewed in the light of his conduct towards the plaintiff and the social assets, forbade the sale and purchase, and whether the price offered and paid was so disproportionate to the market value of the property as to warrant annulment of the sale and deed.

Jones and Wetzel sold the firm's drilling tools and appliances sometime prior to September 12, 1910. Jones and his wife testified that at their home in Doddridge county before the 12th the partners settled the accounts between them, when they ascertained Wetzel owed Jones $1140, and agreed to meet on that day at Parkersburg for final adjustment of the amount by payment in cash or by notes, Jones having received the proceeds derived from the sale of the drilling equipment. The finality of the settlement Wetzel denies. He says that, as he and Jones were not competent to make a settlement, they agreed to meet at Parkersburg and lay the accounts before R. E. Bills, an attorney, and for that purposes Jones, who had kept the firm accounts so far as any were kept and had collected and disbursed the partnership funds, agreed to produce the books and vouchers before Bills; that, as he failed to bring them, and because Wetzel had made arrangements to leave for South America on that day, they entered into a partial settlement, resulting in the ascertainment of an indebtedness in Jones' favor of $1840 instead of the amount first ascertained, in discharge of which Wetzel executed the $300 note and permitted Jones to retain the share of the money then in his hands belonging to Wetzel. In some respects, Bills corroborates Wetzel as to the purpose of the meeting, the agreement to produce the books of account, and Jones' failure to bring them. Though, as we have intimated, and as later clearly will appear, the partners claimed equal interests in the Denning well, Jones

sought to explain the difference in the amounts found due him on the two settlements by saying that, as he and Wetzel had become jointly liable for $1500 advanced by Seiple for drilling the Denning well on condition that each of the three should have equal interests in its production, and as Jones had assumed payment thereof, the first sum ascertained to be due was increased to that extent. Wetzel denied liability as to this advancement, on the ground that, as the sole condition for such interest was payment by Seiple before the completion of the well, a condition with which Wetzel testified Seiple did not comply, having paid that amount to Jones, he, and not the partnership, received the benefit, and, therefore, should refund it. But the fact remains that Wetzel to some extent acceded to Jones' demand in this particular, by what occurred between them on the 12th of September.

In addition to the note and trust securing it, two other papers were then executed; one by Jones and Wetzel under seal, one by Wetzel only but of which Jones was fully advised. The first may not improperly be treated as a division order pertaining to the rental or consideration payable to the partners for the Denning well production, whereby the gas company was directed to pay each of them his share; the other appointed C. T. Hiteshew as attorney in fact for Wetzel, and authorized him to receive and receipt for Wetzel's share of the stipulated monthly payments for gas taken from the Denning well. While the second paper did not in express terms direct Hiteshew to apply the funds so to be collected to the payment of Wetzel's indebtedness, including his note to Jones, it is apparent that Jones, Wetzel and Hiteshew so interpreted it: Jones, because after maturity of the note he applied to Hiteshew for payment; Wetzel, because he so wrote the gas company; Hiteshew, because he paid certain claims out of the collections.

Conceding as established, by the testimony of Jones and his wife, the finality of the settlement of the firm accounts at their residence in Doddridge county, a fact as to which there remains a reasonable degree of doubt and uncertainty, there can be no doubt that it did not include the Denning lease or well. For, as to these, a partnership relation remained,

whether denominated a general or a mining partnership being immaterial, as in either case the partners were still governed by the same strict rule of good faith and fair dealing towards each other in relation to the management and disposition of the social property. 27 Cyc. 760. Legally, neither of them could acquire the whole or any part of the joint property, except where upon close scrutiny and full investigation there is found no fraud, covin or concealment on the part of one prejudicial to the rights and interests of the other. *Gore* v. *McBrayer,* 18 Cal. 589; *Lamar* v. *Hale,* 79 Va. 47; *McKinley* v. *Lynch,* 58 W. Va. 44; *Thorn* v. *Brown,* 63 W. Va. 603; *Krebs* v. *Blankenship,* 73 W. Va. 539, 80 S. E. 948; *Kimberly* v. *Arms,* 129 U. S. 512. The same rule applies, though they were cotenants or co-owners merely. But, working the lease together, as they did, not under any special agreement, they were partners, and, as such, subject to the jurisdiction of equity as if engaged in the prosecution of a general partnership. *Childers* v. *Neely,* 47 W. Va. 70; *Blackmar* v. *Williamson,* 57 W. Va. 70. Though a sale or assignment by one member effects a dissolution of a general partnership (*Conrad* v. *Buck,* 21 W. Va. 396), it does not have that effect on a mining partnership. *Childers* v. *Neely, supra; Duryea* v. *Burt,* 28 Cal. 569; *Blackmar* v. *Williamson, supra;* 3 Lindley on Mines §796; *Lamar* v. *Hale, supra.* A deed of trust by one partner on his share operates as a sale to the trustee; but it does not constitute the latter a member of the partnership. He remains bound by that confidence imposed by law to be fair and just as between the grantor and the beneficiary. The deed to him did not preclude collection by Wetzel or Hiteshew of the grantor's share of the profits from the gas well, nor the right of Wetzel to pay the debt secured and thereby cause a restoration of the title to his interest in the well. He also had the right or equity of redemption adhering in all trust deeds, and an equal part with Jones in the control and management of the firm property. These rights remained intact until the enforcement of the lien created by the trust; of this no doubt can arise.

Wherein, then, did Jones fail, if at all, to observe the requirement for the exercise of good faith toward his partner

Wetzel? Were his dealings such as to avoid imputation to the contrary? If not, then his dereliction must be considered and weighed upon the question of inadequacy of the consideration paid for by him for his partner's interest in the Denning well.

As heretofore observed, Jones knew Hiteshew had authority to receive from the gas company Wetzel's share of the proceeds from the production of the Denning well from the date of the division order. He also knew, or, what is equivalent, he had the means of knowing, that his and Wetzel's shares were equal, and that from the date of the order to December 30, 1910, the date of the interview with Hiteshew, he had received as his share $210.07, not including the December returns, and with these returns $393.09. Wetzel's share was of like amount. With this knowledge, actual or available, on December 30th he applied to Hiteshew for payment of the note. But Hiteshew informed him that he did not then have sufficient funds to discharge the note, but was expecting remittances from Wetzel which he could and would use for that purpose. Hiteshew further testified that with this arrangement or promise Jones apparently seemed satisfied, or did not manifest any dissatisfaction with it or complain of the proposed delay; that Jones did not advise him of the advertisement of the sale then twice published in Ritchie county, or that the note was secured by a trust lien on Wetzel's interest; and that, had Jones informed him of the notice of sale, he could and would have procured or advanced the money and paid the debt. Jones, it is true, testified to the contrary, saying he did inform Hiteshew of the trust and notice. Presumably on the same day, Jones, in conversation with J. W. Roberts, did refer to the sale of Wetzel's interest in the well, when Roberts replied that in order to prevent it he as Wetzel's friend would pay the note if necessary. To this proposal Jones replied he desired to see Hiteshew first and Roberts thereafter in relation to it. However, he did not return pursuant to his promise. This conversation Jones also denied.

Again, at his instance the Bank of Pennsboro, by its cashier, wrote a letter and delivered it to Jones to mail, advising Hite-

shew of the maturity of the note and demanding payment. This letter Hiteshew testified he did not receive, though Jones said he mailed it.

Though, taken singly, these incidents seem comparatively insignificant, yet, combined, they tend to show a design on Jones' part to withhold information which, if imparted, would defeat purchase by him at the trust sale of a share in property the returns from which he knew, as the proof shows, were then highly compensatory and valuable. Of course, no legal duty required him to notify Hiteshew of the sale. But he did advise Roberts. Why not Hiteshew? Was there a' reason for withholding information from one which he voluntarily imparted to the other? Or why did he not return to Roberts after his interview with Hiteshew and get his money, or put to test the faithfulness of Roberts' promise to relieve his friend's property from the encumbrance and sale? Or why did he not say to Hiteshew that the delay suggested was not satisfactory? Can these omissions on his part be explained on any theory other than that of a deliberate design to obtain exclusive control of the Denning lease? This, of course, assumes reliance on the testimony of Hiteshew and Roberts in preference to that of Jones. Why not? They were disinterested witnesses, he an interested one testifying in his own behalf. They had not financial interests to subserve; he had. They were equally as credible as he; one was a bank cashier, the other a dealer in oil properties. So far as we know, their testimony was entitled to credit.

Furthermore, from his own testimony it appears Jones was anxious to eliminate Wetzel from the drilling partnership, from all the forfeited leases, and from the Denning lease by purchase at the trust sale. He had a purpose 'to subserve, that purpose being the acquisition of his partner's interest in property of the value of which he was abundantly informed at that time. His conduct is clearly susceptible of this construction.

Nor do we forget the claim that Jones sought to interest others in acquiring the property. They testified to his efforts in that behalf. But they did not know when or where the property would be offered for sale. Indeed, the note had not

then matured. The sale was only contemplated, not pending; no notice of it had been given. Nor were the persons solicited informed by Jones, or by the published notice, of the time and place of sale. It is true there were bidders present when the property was sold, and one or two of them did make nominal offers for it. They declined, however, to purchase, because they feared some litigation would ensue. The basis of their fear they did not disclose, nor the source from which it arose.

Was the price paid so grossly inadequate as to require a court of equity to interpose its relief by cancellation of the deed to defendant? Under the circumstances, we must return an affirmative answer, notwithstanding a decree to the contrary. In view of the doubtful character of the settlement of the partnership accounts, now here only incidentally involved; the continuity of the relation of partners in the mining, requiring the exercise of the utmost good faith; the promptitude with which Jones caused the trustee to proceed with the execution of the trust; the knowledge that Wetzel was in a foreign land, whence he might return at any time, and the assurance by Hiteshew of payment upon the receipt of anticipated returns from his principal; the withholding of knowledge of the trust and of the preliminary proceedings for its enforcement from Hiteshew; the refusal to accept Roberts' offer to pay; his enmity against Wetzel, clearly established, indeed admitted, and his knowledge of the value of the property purchased—this is the only just and proper answer to be returned to the inquiry. Besides, from the date of the trust to February 2, 1911, the date of the trust sale, a period of less than five months, the returns from the Denning were $912.88, as Jones well knew, Wetzel's share being paid to Hiteshew as attorney in fact. So Jones, for $440, acquired a half interest in property which in the last preceding period of less than five months yielded more than twice what he paid for the interest purchased. Furthermore, many witnesses, abundantly qualified by reason of prolonged experience and definite knowledge derived from the management and control of the well in controversy, testified that on February 2, 1911, the interest purchased was worth from $2000 to $12000, according to their several estimates, only one witness naming

the lowest amount stated. They speak as of the date of Jones' purchase, the date at which the value must be determined. The accuracy of these estimates is reinforced by what the record shows. For the year preceding the trust sale the total returns from the well were $2397.05. For the succeeding year they were nearly twice that amount. These figures speak not the gross but the net receipts, and emphasize the grossly inadequate price paid for the property. They afford sufficient answer to our inquiry. They speak volubly against the acquisition of the property at a price so relatively disproportionate to its actual value. To permit the sale to stand, under such circumstances, would be unjust, unfair, unreasonable.

Did the lower court err in its decree as to the interest claimed by plaintiff in the other leases involved? Excepting the R. R. Jones lease, we think the decree, denying relief, was manifestly right. Wetzel admits the correctness of the testimony of the witness McGinnis to the effect that he did not intend to expend any more money in carrying an interest in them. He said so as a witness in his own behalf, but claimed he excluded the Jones lease. But, giving full credence to the testimony of R. R. Jones, the lessor, of the reliability of which some degree of reasonable doubt may exist, no rental was ever paid as required by the terms of the original lease by him to the partners. He so testified, and was not contradicted by any witness, or by the production of a receipt showing the contrary. If no rental was paid, the lease expired, according to its terms, in January, 1909, more than twenty months before Wetzel left for South America, and two years before he filed his amended and supplemental bill, wherein for the first time he complained of Jones' conduct as to this lease. Moreover, when the suit was instituted Jones was actively engaged in drilling a well on the leased premises. He completed it, and found gas in paying quantities, and not until such completion did Wetzel claim any interest in the R. R. Jones lease. The only fraud charged was that, as under the partnership agreement defendant should have paid the rental, he should not be permitted to profit by his own wrong or negligence in allowing the lease to lapse. But Wetzel did

nothing to protect his interest in the lease, made no provision for payment of his share of the rental, apparently manifested no interest in it, did nòt inquire about it, and delayed suing until Jones had tested the land and found it productive, though Wetzel must have known, or by the exercise of reasonable diligence ought to have known, the lease had lapsed and that Jones was drilling on the land for his exclusive benefit under a lease in his own name. Nor did Wetzel, by way of amendment, tender payment, or offer to pay any part of the cost and expense of drilling the well. Under these circumstances, the lower court properly denied relief as to all the leases except that on the Denning lands. *Westerman* v. *Dinsmore,* 68 W. Va. 594.

Being of opinion, for the reasons heretofore stated, to reverse the decree of February 25, 1913, in so far as it denied the prayer of plaintiff for annulment of the sale by Broadwater, trustee, on February 2, 1911, under the deed of trust executed to him by Wetzel on September 12, 1910, and the cancellation of the deed by such trustee to defendant dated February 3, 1911, and awarded costs against the plaintiff and to grant such relief, a decree will be entered here setting aside such sale and cancelling such deed, remanding the cause for further proceedings in accordance with the principles herein announced, and awarding costs according to law.

*Reversed in part. Affirmed in part. Remanded.*