# CHARLESTON

THORNE *v.* BROWN.

Submitted June 7, 1907.   Decided February 18, 1908.

| 63 | 603 |
|----|-----|
| 65 | 37 |
| d65 | 38 |

1. PARTNERSHIP—*Dealing Between Partners—Good Faith.*

A member of a co-partnership, in negotiating for the purchase of the interest of another member of the firm in the social assets and business, is bound to fully and completely disclose all information in his possession, relating to the subject matter; and, if by concealment thereof, or by misrepresentation concerning the same, he obtains advantage of the other party, the contract is voidable, and will be set aside as having been fraudulently obtained, on proof of the fact of concealment, or misrepresentation, or both.  (p. 605.)

2. PRINCIPAL AND AGENT—*Fraud of Agent—Contracts.*

If an agent, in dealing with his principal about the subject matter of the agency, obtains an advantage by the suppression of the information, concerning the same, acquired by means of the agency, or by misrepresentation, his contract is likewise voidable.  (p. 612.)

3. PARTNERSHIP—*Good Faith—Evidence—Weight.*

Declaration of intention on the part of one member of a firm to use information concerning the firm business, in an effort to obtain undue advantage of another member, will be taken strongly against him, when it appears that he has subsequently obtained such an advantage, and the evidence is contradictory as to whether, in doing so, he suppressed the information or misrepresented material facts pertaining to the subject matter.  (p. 611.)

Appeal from Circuit Court, Harrison County.

Bill by Joseph W. Thorne against John W. Brown and others.  Decree for plaintiff, and defendant Brown appeals.
*Affirmed.*

DAVIS & DAVIS, for appellant.

HUBERT T. HOUSTON, E. G. SMITH and EDWARD A. BRANNON, for appellee.

POFFENBARGER, PRESIDENT:

Joseph W. Thorne, an associate of John W. Brown, Jay Reefer and W. P. Goff, in a brokerage contract for the sale of coal land in the year 1903, brought this suit in the circuit court of Harrison county, for the purpose of setting aside a contract, bearing date October 22, 1903, by which he had disposed of his prospective share of the commissions on the sale to said Brown, in consideration of $600.00 in cash and $1,400.00 to be paid thereafter upon certain conditions.  His original and first and second amended bills charged Brown with fraud in the procurement of said contract, consisting of the suppression and concealment of certain information to which the plaintiff was entitled and affirmative acts of misrepresentation concerning material facts pertaining to the subject matter of the contract.  At the time of the institution of the suit there was, in the hands of W. P. Goff, the sum of $4,625.00, one-fourth of the commissions, to which Thorne would have been entitled, but for his contract of sale thereof to Brown, and which Brown claimed.  Goff was enjoined from paying it over to Brown and it was afterwards paid to the general receiver of the court under an order made in the cause.  The court, in its final decree, canceled and set aside the contract and adjudged the fund to Thorne; and, having allowed the receiver commission on the fund amounting to $259.60, and required repayment to Brown of the $600.00 which he had paid to Thorne, then amounting, with interest, to $688.00, directed the receiver to pay out of said sum the costs of the suit, including the commissions of the receiver, and then pay the residue thereof to Brown.  Having then ascertained that there still remained in the hands of the receiver $4,503.62, the court ordered him to pay it to Thorne. From this decree, Brown has appealed.

The fraud imputed to Brown by the allegations of the bill consists of advantages he is alleged to have taken of the gross intoxication of Thorne on the date of the execution of the contract and prior thereto; alleged acquisition of undue influence over Thorne, while in this condition, by creating, on his part, prejudice against, and suspicion and distrust of, Reefer and Goff, to the end that his opportunities to obtain information concerning the progress of affairs might be limited to such as Brown might see fit to afford him; concealment of information respecting the probability of the consummation of the sale from which the commission was to be derived, and misrepresentation of the acreage of the coal to be sold and of the costs and expenses to be paid out of the commissions. Inadequacy of price, Thorne's financial distress and Brown's haste in the procurement of the execution of the contract and concealment thereof from Reefer and Goff are also relied upon as circumstances tending to prove fraud, as well as to sustain the oral testimony of the plaintiff and his witness, against the contradictory testimony of the defendant and his witnesses. As to all matters bearing directly on the question of fraud, the testimony is contradictory. Brown denies positively any knowledge of the drunkenness of the plaintiff, inadequacy of the price under all the circumstances, and concealment of any information that could have been of any value to Thorne. In view of this state of the case, much evidence was taken both to impeach and sustain Brown's reputation for truth and veracity, as well as for fairness and honesty in business transactions.

The record contains five or six hundred pages of testimony. It would be a burdensome and useless task to undertake to detail it all here. Only enough, therefore, will be set forth to indicate the character of the transaction out of which the subject matter of the suit arose, and the substance of the contentions as to specific acts of fraud charged. Thorne and Reefer had been partners as real-estate agents or brokers at Clarksburg. As such, they obtained from Adolphus Armstrong and John H. Kunst authority to sell the coal in a tract of 1200 acres of land. Brown, knowing certain persons desired to buy a tract of coal land, called upon Reefer and Thorne and it was agreed that he should furnish a buyer for this tract of land at the price of $210.00 per acre, and, as the

owners required $175.00 an acre, the profit to be derived would be the difference, about $42,000.00. Thereupon Brown began negotiations with the Maryland Coal Company, and, on October 28, 1902, George Brackett, a representative of said company, went over the land with him, Thorne and Reefer, and they quoted him a price of $225.00 per acre, which would have made their profit about $60,000.00. Soon afterwards, the coal company declined to further consider the matter, stating the want of transportation facilities as the reason, but said, if agreements or arrangements could be made for transportation, the company would renew negotiations. In the meantime, it was ascertained that W. P. Goff had an option upon the coal in an adjoining tract, containing 1600 acres, belonging to John T. McGraw, and, as McGraw owned a short line of railroad, known as the Sand Lick Railroad, leading up to these two tracts of land from the Baltimore & Ohio Railroad, Brown, Reefer, Thorne and Goff conceived the idea of combining the two properties and selling them together. So they agreed to attempt to effect a sale of both to the Maryland Coal Company and share the profits equally. On the 21st day of January, 1903, F. E. Brackett, on behalf of that company, entered into a written conditional contract with Goff, Reefer, Thorne and Brown, for the purchase of the property which the company ratified on the 12th day of February, 1903. On the 16th day of May, 1903, it declared its intention to take the property. In the meantime, Armstrong and Kunst had raised the price of their land to $215.00 an acre. In July or August, 1903, the coal company concluded it did not want the Armstrong and Kunst coal, but continued to negotiate for the McGraw property, Brown, Goff, Reefer and Thorne having concluded to sell that tract alone, in view of the unwillingness of the coal company to purchase the other. From this time active negotiations went on until December 8, 1903, when the commission money was paid, but the consummation of the deal had been practically assured more than a month prior to that date.

Difficulty was found in effecting an agreement with the Baltimore & Ohio Railroad Company for apportionment and supply of cars and with McGraw for the purchase of his railroad and certain surface land demanded by the coal company. On the 20th day of October, 1903, the Maryland Coal Company ap-

proved the agreements concerning the traffic arrangements, proposed by the Baltimore and Ohio Railroad Company, and, on the next day, Brown was notified. This approval was subject to one condition, however, namely, that satisfactory arrangements should be made with McGraw for the transfer of the Sand Lick Railroad. McGraw was notified on or about the same day. Negotiations with him concerning the little branch railroad had been in progress for some time. He had, at one time, proposed to convey to the coal company, along with the coal, certain surface lands demanded by the company, provided the brokers should pay him ten thousand dollars out of their commission, or, in case of acceptance of the compromise proposed by the coal company, he expressed a willingness to do what this compromise imposed upon him, in consideration of five thousand dollars, to be paid by the brokers. This proposition was made June 26, 1903, and accepted by the brokers. On July 2, 1903, it was revoked. Sometime later, October 21, 1903, according to the testimoney of Reefer and others, McGraw signified his willingness to convey the railroad by way of inducement to the sale, and forego participation with the brokers in their commission. This he might well have done, in view of the fact that he was to get $200.00 an acre for the coal and the tract was large, the area having finally been fixed at 1117 acres. The advantage to the brokers was $25.00 per acre, making their commission about $28,000.00. The Sand Lick Railroad was not actually conveyed until the 11th day of March, 1904, but, as McGraw received his purchase money November 17, 1903, and the commission was paid to Goff on the 8th day of December, 1903, the conveyance of the railroad must have been assured prior to these dates.

As McGraw resided and did business at Grafton, the negotiations were carried on at that place and Reefer, Brown and Goff made frequent trips there all through the summer and fall of the year 1903, sometimes negotiating with McGraw alone and at other times with him and the representatives of the coal company. Numerous meetings of the brokers occurred at Clarksburg, where they resided, and generally at the office of Reefer and Thorne. Thorne attended these meetings until about the last of August. After that date, according to his testimony and that of Reefer and others, he

absented himself from them and refused to go to his office. As to the reason for his conduct in this respect, the evidence is somewhat uncertain. His own testimony is not entirely consistent. At one time he attributed it to coldness on the part of Reefer, due to Thorne's having reproved or scolded Reefer's children, they having been close neighbors. At another time, he says Brown had aroused suspicion and distrust in his mind against Reefer, by reference to his nationality, he being a Jew, and the fact that, as tenant of Thorne, he was considerably indebted to him for rent. He seems also to attribute the coldness between himself and Reefer to the fact that, owing to his dissipation, an undue amount of work had been imposed upon Reefer. However, it seems that he had little, or no, communication with Reefer and Goff during the months of September and October and depended entirely upon Brown for information. Brown had received notice of the approval of the Baltimore and Ohio Railroad Company traffic agreements on the 21st day of October, 1903. Reefer swears that on the same day, he informed Brown of the fact McGraw had signified his willingness to convey the Sand Lick Railroad without charge to the brokers. Brown denies that he received any such information from Reefer, but Reefer's testimony is supplemented by that of George P. Eckes, who says he was in Reefer and Thorne's office and heard him tell Brown over the telephone that McGraw had agreed to do so. Brown swears that he showed Thorne a telegram announcing the approval of the traffic agreements, but Thorne denies it and says he knew nothing of it. That Brown acted quickly in obtaining his contract from Thorne after having received notice of the acceptance of the Baltimore and Ohio traffic propositions by the coal company, admits of no doubt. He obtained it the next day. Thorne says he had no knowledge at that time of the state of the negotiations with the railroad company, while Brown swears he disclosed to him all the information he had. Thorne also says Brown had represented that the area of the coal had been ascertained by survey to be only 900 or 1000 acres, in consequence of which the commissions would be less than they expected, and that the expenses of the enterprise would be much larger than they actually were. There had been some uncertainty as to the quantity of the coal. Errors had been committed in the first

surveys and calculations made and there is much contradictory testimony as to when the quantity was correctly determined and as to whether Thorne and Brown knew what it was at the time they contracted. It seems fairly clear that the former had reason to know in August, 1903, that there was uncertainty about the matter, but it is claimed that Brown knew exactly what it was on October 22nd, and concealed his information. This he emphatically denies and introduces witnesses to refute it. There was also a good deal of uncertainty as to the amount of the expenses. Originally, they had anticipated $60,000.00 of commission on the Armstrong and Kunst land, but a very heavy cut was made in it by the action of the owners in raising the price of the land from $175.00 to $210.00 per acre. Before this happened, the brokers had made an estimate of their profits and expenses, in which there was included the following items of outlay: to A. C. Fisk $12,000.00; to F. B. Hambrey $6,000.00; to Geo. Brackett $5,000.00; to Davis & Davis, Attorneys, $1,000.00; and to John Bassel $500.00. Afterwards, the amounts were fixed, by proration, as follows: Fisk $2,400.00; Hambrey $1,200.00; Bracket $1,000.00; Davis & Davis $1,000.00; and Bassel $500.00. There is but little doubt, if any, that Thorne knew of this, and it is claimed that these items or some of them were the subjects of the alleged misrepresentation, concerning costs and expenses. The proposed reduction of the Brackett claim was not accepted. He asserted the whole of it, against the fund arising from the McGraw land, and it was finally fixed at $2,500.00, after the sale by Thorne to Brown. In view of these facts, Brown insists that the matter of costs was not only uncertain and undetermined in material respects, but also that Thorne knew all about it. In view of the uncertainty as to the acreage of the coal and the demands of Fisk, Hambrey and Brackett, Brown's representations concerning the amount of the expected commissions and the deductions to be made therefrom, may have been honest and fair. But, if it be true that Thorne had been on a protracted debauch and Brown, knowing this, had contrived to alienate him from his other associates, and so cut him off from all sources of information except himself and secure sole and implicit reliance upon himself, and then concealed from him the information in his possession, well calculated to induce be-

lief that the sale would be consummated in a short time; or, being cognizant of his avoidance of them for any reason, and reliance upon him for information, withheld such information, a court of equity would not allow the contract to stand, however truthful he may have been in his representations concerning the acreage of the coal and the charges to be deducted from the commissions.

That Brown did intend, at a time when the whole matter was in a state of doubt and uncertainty, to turn such exclusive information as he could get to his individual advantage, is disclosed by certain letters he wrote to an attorney of the Maryland Coal Company. These letters evince, not only intention to take advantage of somebody connected with the property, but also suggest knowledge on his part of weakness in some person from whom he expected to obtain it. The first of these letters was written October 14, 1903, when he knew the directors of the coal company would soon meet to consider the traffic propositions made by the Baltimore and Ohio Railroad Company. In it he said: "If you will wire me the fact as soon as you are assured beyond doubt that the deal on the McGraw coal is closed or will be, so that I am safe in advancing money on that fact, I can make you $300.00 in addition to some for myself by legitimate manipulation, unless I am very much mistaken in the temper of some parties. On receipt of your wire, I will apprise you of the result within twenty-four hours." The attorney declined the proposition, but said: "I am advised that our people meet on Tuesday next week, 20th inst., to consider the proposed B. & O. agreements and to decide whether to accept or reject them." On October 17, 1903, Brown followed the matter up in the following terms: "As to the information I ask for on the 14th aside from wanting it in advance, you know I am an interested party and should by right have this information as soon as it is known by any other connected with the deal. So there is no room for complaint if I get it "a day ahead." The directors met three days later, and approved the B. & O. agreements, subject to the making of satisfactory arrangements about the Sand Lick branch road, and Brown was apprised of this by a telegram on the 21st. On the 22nd he procured his contract from Thorne, and did not disclose the fact to either Reefer or Goff for some time

afterwards. Moreover, Thorne says he cautioned him against making any disclosure. At the same time, however, he says he had another motive in remaining silent, namely, his indebtedness, amounting to $4,500.00. Not having received for his interest a sufficient sum to enable him to pay it, he did not want his creditors to know he had sold his interest, lest they might think he had realized sufficient money to pay them and immediately demand settlement.

In view of the proof of intention and design on the part of Brown to take advantage of some of his associates and the fact that he did obtain an advantage of Thorne, and that Thorne's "temper" at the time of the correspondence between Brown and the attorney was apparently such as to make him an easy victim for Brown, we cannot say the circuit court erred in resolving the doubts against him arising out of the conflicting evidence touching details of the negotiations between them. This disclosure plainly shows a declaration of specific intent to do what he is charged with having done. Having received the information he wanted, there is no suggestion on his part of any use he made, or intended to make, of it, for the common benefit of himself and his associates. Besides, his written declarations show intention to use it for his own personal benefit, and it is difficult to see how he could have turned it to his personal advantage through any person other than an associate. To the detriment of what other person could he have used it? McGraw? Not likely, since he held the key of the entire situation. Though inadequacy of price alone, under all the circumstances disclosed, tending to show uncertainty as to the amount Thorne would realize from the commissions, might not be sufficient to establish fraud, and although we might conclude that some of the controverted matters of detail should have been found in favor of Brown, on the theory that the circumstances corroborate him and sustain his statements, we must assume that the circuit court based its finding upon consideration of all the evidence and all the circumstances disclosed; and, upon consideration of the entire evidence, we are unable to say the finding is wrong. On the contrary, it seems to use that Brown's conduct in the matter was not characterized by the fairness and frankness that ought to obtain between partners or principals and agents.

The suggestion of *laches* or acquiescence on Thorn's part, by reason of his tardiness in demanding rescission, is not well founded. He declined to receive the second payment within a month after the contract was signed, and, in less than two months, offered to repay the $600.00. The argument is that he delayed his demand until the commission had been paid, to the end that he might be in a position either to affirm or repudiate the contract, as his interest might suggest, but we are of the opinion that the period of delay was not unreasonable. He was entitled to some time in which to ascertain the facts bearing on the question of good faith on the part of Brown.

There is no controversy as to the legal principles applicable to cases of this kind. The only contention is that Brown did not abuse or take advantage of the confidential relation subsisting between him and Thorne, and which he was bound under the law, to respect. It is unnecessary, therefore, to discuss or elaborate upon the principles declared in *McKinley* v. *Lynch*, 58 W. Va. 44, *Newcomb* v. *Brooks*, 16 W. Va. 32, *Liskey* v. *Snyder*, 56 W. Va. 610, and numerous decisions of other courts referred to in the briefs. By virtue of the relationship subsisting between the parties, whether we say they were strictly partners or not, Thorne was entitled to all the information Brown possessed relating to the subject matter of their dealing. If we say they were mutually and reciprocally principal and agent, all the information obtained by the agent belonged to his principal and he could not use it as a means of benefitting himself at the expense of his principal. The element of agency involved in a copartnership imposes upon each member a high degree of fairness and good faith to his associates. Under the law of agency, all of his knowledge and information of the partnership business, property and rights, belong to his associates as well as to himself, and his concealment thereof in transactions between themselves, working injury and detriment to them, amounts to fraud.

No ground upon which the appellant can be relieved from the payment of the general receiver's commission is perceived. Goff, a defendant, was permitted, on his request, to pay the fund in controversy to the receiver. It was the subject matter of the litigation and the issue was, not one of mere

right to participation therein as a distributee or lienor, but of title, as in the case of *Nutter* v. *Brown*, 58 W. Va. 237, and the litigation was occasioned by the wrongful act of the defendant.

Seeing no error in the decree, we must affirm it.

*Affirmed.*