# CHARLESTON

KYLE v. GRIFFIN *et al.*

Submitted March 23, 1915.   Decided April 20, 1915.

1. PARTNERSHIP—*Determination of Scope—Extent of Joint Undertaking.*

     The scope of a partnership is determinable by the extent of the joint enterprise or undertaking, not by the limitations the partnership agreement imposes upon the agency of the members of the firm. (p. 227).

2. SAME—*Scope—Dealings in Realty.*

   A partnership having for its purpose the purchase and sale of real estate for profit extends to such parcels not actually purchased, as were contemplated as a part of the joint undertaking, even though it was within the power of any member of the firm to prevent the purchase thereof, by withholding his approval of their character or price or terms.   (p. 227).

3. SAME—*Scope—Dealings in Land—Secret Profits—Liability of Partner.*

   In such case, occasional expressions of unwillingness of members to purchase a given parcel, when conditions are unfavorable, do not eliminate it from the scope of the enterprise, and a member secretly purchasing and selling it, when conditions are favorable, in violation of the general agreement, may be held to an accounting for the profits, by his associates.   (p. 227).

4. SAME—*Compensation for Services—Rights of Partner.*

   A member of a partnership, all the members of which are active and give time and service, is not entitled to compensation for his services, in the absence of clear proof of a special agreement therefor.   (p. 230).

   (LYNCH, JUDGE, absent.)


Appeal from Circuit Court, Harrison County.

Suit by Jasper S. Kyle against Sheridan R. Griffin and others.   From a decree for plaintiff, the defendant named appeals.

*Affirmed in part.   Reversed in part.   Remanded.*

*Davis & Davis, Smith & Jackson, John Bassel* and *Homer Strosnider,* for appellant.

*James Edward Law* and *Geo. M. Hoffheimer,* for appellee.


POFFENBARGER, JUDGE:

Griffin has appealed from a decree enforcing Kyle's claim to right of participation in the profits arising from the sale of certain areas of coal, on the theory of a partnership relation between them, and Kyle cross-assigns error in a later decree in the cause, allowing Griffin a commission of $5.00 an acre for his services and expenses in and about the sale of other areas of coal in which both were equally interested.

Sheridan R. Griffin, Jasper S. Kyle and A. B. Van Osten were equal and joint owners of numerous tracts of coal, mak-

ing a consolidated area of 4823.66 acres in the counties of Doddridge and Wetzel, which they had purchased for re-sale. These purchases began in June or July, 1902, and continued until late in the year 1905. On the 27th day of November 1905, they owned about 4000 acres and then executed an option thereon to L. C. Wyer, which seems to have included an additional 500 acres they had not yet acquired. On the 12th day of December 1905, this option, was renewed or extended and enlarged so as to cover 5000 acres, the parties agreeing to obtain and convey additional coal, in case the option should result in a sale. With the assistance of Wyer, these tracts were sold to William F. Baird in January, March and May 1906, at a large profit.

Being men of limited means, these parties carried on their operations under considerable embarrassment. For the most part, the money with which they paid for the coal was borrowed in various forms and they had some difficulty in finding enough to take all their enterprise contemplated. This circumstance seems to have brought about the peculiar relations respecting other coal out of which the present controversy has arisen. There were coal areas known as the Dewhurst, Hardman and Danial Bates tracts, containing, respectively, 3066.25, 1122.15 and 347.9 acres, which, by reason of their location, could have been included in the enterprise and handled advantageously with the 4823.66 acres Griffin, Kyle and Van Osten succeeded in consolidating and selling as aforesaid. The Dewhurst, Hardman and Bates coal, with some additional tracts, making in the aggregate about 5500 acres, were purchased by Griffin and one Michael A. Brast. On the same day on which Griffin, Kyle and Van Osten gave Wyer their first option, Griffin and Brast optioned to him 5500 acres of coal including the Dewhurst, Hardman and Bates tracts. Three days later, Griffin and Brast bought the Dewhurst coal and near that date, the Hardman and Bates coal, all of which together with additional tracts, they sold, in the year 1906, to William F. Baird, at a very considerable profit, and executed conveyances thereof. Claiming the purchase of the Dewhurst, Hardman and Bates coal had been contemplated by the alleged copartnership and that Griffin's purchases thereof in connection with Brast were

secret and legally fraudulent as to him and Van Osten, Kyle claims right of participation in one-half of the profits he realized from these areas and demands an accounting respecting the same as well as the profits arising from the sale of the 4823.66 acres.

Griffin denies the existence of any partnership relation among the parties, saying they were mere tenants in common of the numerous tracts of coal, constituting the boundary of 4823.66 acres. If this contention cannot be sustained, he insists there was no general partnership for the purchase and re-sale of coal, but only a limited one embracing the land actually purchased and re-sold by them. These positions are based largely upon the terms of the following instrument:

"This, Memorandum of Agreement, by and between Sheridan R. Griffin, Jasper S. Kyle and A. B. Van Osten, all of Clarksburg, W. Va.

CERTIFIES, that, all of a certain lot of coal and coal privileges, bought in Doddridge County, W. Va. through the agency of J. F. Dye, Luther E. Kyle, and a few pieces from Chas. S. Hornor : the deed for the said several tracts, and for individual tracts, are being taken in the name of Sheridan R. Griffin trustee, for the use and benefit of said Sheridan R. Griffin, Jasper .S. Kyle and A. B. Van Osten; and it is agreed by each of them, that, they will bear equally the cost of purchasing said coal, and the contingent expenses, incurred in taking up said coal and taking deeds, etc. for same.

And that, they, each of them, and after them their heirs and assigns, are to hold an equal interest in the property so purchased, or any profits arising from any sale of said coal property.

The aggregate amount of said coal properties, so bought and so deeded, is about Three Thousand Acres, (3000).

Witness the following signatures, and seals, this 20th day of December, 1902.

SHERIDAN R. GRIFFIN     (SEAL)
JASPER S. KYLE ·        (SEAL)
A. B. VAN OSTEN         (SEAL)

Reading this paper in connection with extraneous evidence disclosing the circumstances under which it was executed, the previous and subsequent situation and conduct of the parties

and their purposes, the appellee insists that it does not define the relation of the parties so as to limit it to a tenancy in common or a limited partnership excluding the Dewhurst and other tracts. It was executed, as its date shows, December 20, 1902, several months after the commencement of the operations to which it relates. At that time, the parties had acquired about 3000 acres of coal. Between that date and the date of the option given to Wyer, they obtained an additional 1000 acres which confessedly went in with the 3000 and was disposed of upon the same basis. Still later there was an addition of more than 800 acres. Kyle's right to participate in the profits from these additional tracts is not denied. The circumstances constituting the inducement to the preparation and the execution of the memorandum are also relied upon. Conveyances of the 3000 acres mentioned in the agreement had been taken generally in the name of Griffin, trustee, and he had become critically ill of typhoid fever. As the conveyances did not disclose the names of the beneficiaries of the trust, Griffin's associates naturally became solicitous about the result of his illness. His death, without written evidence of the status of the property they had jointly acquired, might have seriously embarrassed them, since the law would have closed their mouths as to personal transactions with him. Therefore they deemed it highly important to have an agreement or memorandum in writing, setting forth their interests in the coal. This memorandum was prepared by Kyle, a layman, and, read in the light of the circumstances under which it was drafted and its purpose, his counsel think it is to be regarded as an agreement within the alleged copartnership, rather than a writing defining, in all respects, the relation of the parties and its scope.

Support of the view of a mere tenancy in common and limited partnership is sought in the method by which purchases of coal were made. None of the parties possessed or exercised the right individually to make binding purchases for the association. No tract of coal was taken in otherwise than upon the unanimous approval by the parties, of its location, character and price. The association maintained no office known as a firm office. Mr. Kyle had an office in which the most of their business was transacted, but it seems to

have been known as his. They maintained no firm bank account. No firm books were kept. Each party kept a memorandum of the money advanced by him and of his own transactions pertaining to purchases. Considerable amounts of cash were advanced to the farmers from whom the coal was purchased but much of it was obtained from banks on the individual and joint notes of the parties. The purchase money was only partially paid in cash. Large indebtedness for deferred payments was carried. In the consummation of the sale to Baird, an effort was made to obtain sufficient cash to pay the original purchase prices of the coal, but this was not accomplished. In lieu thereof, Baird's notes were taken and used at the banks as collateral in the procurement of the greater part of the money necessary to discharge the obligations to the land owners. The profits on the sales were represented by Baird's notes, secured by vendors liens, which seems to have been divided among the parties. At the time of the institution of this suit, there had been no settlement or adjustment of the interests and rights of the parties, and all admit the necessity of a settlement. In other words, full and complete adjustment of expenses and distribution of profits had not been made during the progress of the business or on the completion of the sales.

The inception of this enterprise was the association of Griffin and Kyle in the procurement of certain coal interests held in the names of J. F. Dye, Luther E. Kyle and Chas. S. Hornor in Doddridge County. Immediately after they became so interested, Van Osten was induced to join them. The interests so obtained embraced the coal in numerous tracts of land, either lying contiguous to one another or so related as to be susceptible of easy consolidation into what is denominated a coal field. From the date of this beginning, June or July, 1902, until the latter part of the year 1905, the work of acquiring and perfecting the titles to these parcels of coal and some others was diligently and successfully carried on. As shown by the agreement herein quoted, they had acquired, on the 20th day of December, 1902, about 3,000 acres. At the date of the execution of the option to Wyer, they had gotten in about 4,000 acres. From that time until the closing of the

option and consummation of the sale, they had gotten together an additional 800 acres.

During this period, Griffin was interested in a number of other coal transactions, in which Kyle and Van Osten do not claim to have been concerned, but most of these were in other locations and the lands unrelated in any way to the consolidation enterprise in Doddridge County. All three, however, were interested in the purchase and sale to C. W. Lynch and others of 419.89 acres, lying east of the lands they sold to Baird. The options on these lands had been acquired by Kyle and one Elliott. These holdings were turned over to the alleged partnership and a profit of $500.00 thereon allowed to Elliott. Griffin relies upon this circumstance as proof of Kyle's separate transactions in coal within the life of the copartnership. Kyle got $50.00 from Elliott, out of this transaction, which he claims was a mere allowance for expenses in the procurement of the options, and denies his association with Elliott in the transaction as a separate or hostile one. Elliott is indefinite as to their exact relation and Kyle's motive, but says he and Kyle procured and held the options together. Whatever their true relation was, all of Kyle's interest, except the $50.00, went into the joint enterprise. Before the association of these parties, Griffin had consolidated a considerable area of coal which he sold to McDonald and Cray. Portions of this coal had been obtained from H. L. Smith, and, in that transaction, he claims to have purchased 139 acres, which was subsequently conveyed to him and offered to the alleged copartnership. He says Kyle and Van Osten both declined to take this tract in. It was subsequently sold and conveyed to Pritchard. Kyle assisted in the sale thereof and received $369.67 out of the proceeds, which he says was on account of his share of the profits. Griffin says he employed Kyle to make the sale and this payment was made to him by way of compensation for services only. This tract, though in Doddridge or Wetzel County and not far from the Dye, Luther Kyle and Hornor lands, did not adjoin them. Griffin also obtained some other small tracts still farther away from the association nucleus, the title to which he still holds. Kyle insists that these tracts were partnership property and produces some memoranda in which they

are so designated. At one time a charter for a corporation through which the parties expected to handle all of these coal lands was procured, and the draft of a deed for the conveyance thereof to the corporation, showing the inclusion of some of these outside tracts, is produced by Kyle. Griffin admits the preparation of such a 'deed, but denies any direction on his part to include. said tracts. The corporation was never organized nor the deed executed.

The area which Kyle seems to have considered as the nucleus of the coal field contemplated by the enterprise lay a short distance from a branch of the Short Line Railroad, and, between it and said branch railway, were the Dewhurst lands and two small tracts known as the Carrell and Carlin lands. The locations of the several tracts known as the Hardman group and the Bates tract are not very well defined, but they seem to have been contiguous to the Dewhurst tract or very near it. All of these lands seem to be in Wetzel County. · In a suit pending in the Circuit Court of the County, a sale of the Dewhurst coal had been decreed and S. Bruce Hall appointed a commissioner to make it. Early in the year 1903 or 1904, as to which the evidence is somewhat conflicting, Griffin, Kyle and Van Osten went to New Martinsville and made inquiries concerning the Dewhurst coal. If this visit was made in 1904, Kyle had had some previous correspondence with Mr. Hall about the coal. On January 11, 1904, he wrote Hall a letter concerning it, and, on January 18, 1904, received a reply. Kyle says a bid of eight dollars an acre was made 'on the coal at that time, but this is denied by Griffin and Van Osten does not remember it, if it occurred. On this occasion, they came in· contact with Mr. Brast, and, according to the testimony of Kyle, an arrangement was made with him to keep the alleged partners advised concerning the status of the Dewhurst coal. Griffin says the primary object of the visit to New Martinsville was a loan from one of the banks at that place, but Kyle and Van Osten say they had in view the coal as well as the loan. Brast says they inquired about the coal and wanted an option on it, but were advised by Hall that it could not be optioned. All the parties to this controversy were undoubtedly impressed with the advantage of this property in connection with their holdings,

76 W. Va.

but they seem to have been financially embarrassed. · The loan sought at New Martinsville failed. There is evidence tending to show that, on a tracing and blue print of the coal purchased and regarded as desirable, the Dewhurst, Hardman and Bates tracts were included within a red line drawn around these holdings on the tracing and blue print. Some of these papers were put in evidence in this cause. After the visit to New Martinsville, Kyle and Van Osten do not seem to have made any further inquiry concerning the Dewhurst coal, until about the time of the execution of the option to Wyer, or later. In the fall of 1904, Griffin, Kyle and Van Osten had the Hardman group of coal under discussion and later Kyle says he talked with Hardman about it and made a tentative verbal agreement with him respecting it. The Bates tract had been under discussion, but, when Kyle endeavored to obtain it, he found Brast had it under option.

Griffin and Brast purchased the Dewhurst tract, November 30, 1905, and obtained a deed for it December 21, 1905. The Hardman group and the Bates tract seem to have been purchased later. Brast purchased these lands in his name, but Griffin contributed to the purchase money and an undivided half interest therein was afterward conveyed by him to Brast. Griffin says he first resolved to purchase the Dewhurst tract sometime in the summer of 1905, and denies any intention on his part, at any previous time, to buy it. He insists that, on numerous occasions, Kyle and Van Osten were requested to join him in the purchase thereof, and that they declined to do so. This is emphatically denied by Kyle. Van Osten considered the Dewhurst coal desirable, but felt that his holdings were as large as he cared to make them, in the absence of any prospect of immediate sale. Virgil L. Highland testifies that Van Osten, on one or more occasions expressed his unwillingness to enter upon the purchase of the Dewhurst coal, when advised by him to do so. Van Osten admits that, at the time of the excution of the option to Wyer, he had given up the idea of buying more coal, but he says he has no recollection of any requst on the part of Griffin, after the visit to New Martinsville, to take any interest in the Dewhurst coal. He says Griffin was anxious to obtain more coal and had so expressed himself, and that he, Van Osten,

had been unwilling to take more, but he does not recall any mention of the Dewhurst coal, in that connection. He further says, however, that at the time of the execution of the option to Wyer, or immediately afterwards, he did want an interest in the Dewhurst tract, and so expressed himself to Kyle and induced him to write Hall a letter of inquiry. He also states very positively that Griffin never intimated to him, at any time, his purpose to purchase that coal, and denies knowledge of his association with Brast in the ownership thereof, until some time after it had been accomplished. Brast on cross-examination, was unwilling to swear he had told Kyle or Van Osten that he and Griffin intended to purchase the Dewhurst tract, but he insists that he informed Kyle sometime after the purchase was made and while the sales to Baird were in process of consummation. Neither Wyer nor Baird had any conversation with Kyle, until about the date of the execution of the option to Wyer, and Baird likely had none for sometime after that date. Both say Kyle admitted to them his knowledge of Griffin's relation with Brast and expressed himself as being pleased with the result of the entire transaction. All of this, Kyle most emphatically denies.

According to the testimony of Kyle and Van Osten, measurably corroborated by documentary evidence and admissions of Griffin, some of the tracts of coal obtained by Brast and conveyed to Baird by him and Griffin would have been acquired and put in under the 5000 acre option, but for Brast's activity in the field, after the execution of that option. Griffin denies this, saying an imaginary line of separation between Brast's operations and those of Kyle and Van Osten was established, but the evidence of this is rather slight. Kyle and Van Osten both testify to their effort to obtain tracts Brast acquired. While they had no option on the Hardman group, Kyle says he had a tentative verbal agreement with Hardman under which they were to be taken over, upon the presentation of an opportunity for sale thereof.

That Kyle and Van Osten desired all the coal they could safely handle is beyond doubt and it is equally certain they wanted the Dewhurst, Hardman and Bates coal, if they could handle it. The embarrassments were lack of money to obtain

and carry these tracts and improbability of an early sale thereof at a profit. Nor can their special interest in the locality in which these tracts were be denied. In conjunction with Griffin, they were pursuing the method usually adopted for profitable dealing in coal in place, consolidation of as large an area as can be carried and sold. Any contignous marketable coal is ordinarily treated as being within the scope of such an undertaking provided the financial ability of the purchaser is sufficient to carry it, or his opportunity for a quick sale of it justifies the purchase. Not until the execution of the Wyer option, did these parties see any prospect of sale, and, until that time, they were carrying about as much coal as their money and credit justified and perhaps more. Under such circumstances, the disinclination of Kyle and Van Osten ·to enter upon a $25,000.00 to $45,000.00 undertaking, such as the purchase of the Dewhurst coal, was perfectly natural and accordant with the usual practice. None of the parties thought it safe to buy the Dewhurst coal at $8.00 in 1903 or 1904. Neither Brast nor Griffin ventured then. Through those years and down to the latter part of 1905, Griffin, Kyle and Van Osten were carrying a heavy load. Purchase money notes were falling due and could not be paid. Obligations in the banks were embarrassing also. The interest charge was becoming burdensome. The silver lining to this dark cloud was the Wyer option. It immediately aroused Brast and Griffin to action. On the third day after its execution, they bought the Dewhurst coal and Brast became active in the procurement of the Hardman, Bates and other tracts. Kyle and Van Osten, on the appearance of Wyer, were willing to option 500 acres more coal than they had and so conditionally bind themselves to obtain and convey it. On the extension thereof, they willingly added another 500 acres they did not then have. Had they been advised that Wyer wanted or would take an option for 5500 acres more, including the Dewhurst, Hartman and Bates tracts they might have joined in that. There is no pretense that any such a proposition was then and there made to them. That 5500 acre option bore the same date as the 4500 acre one, but was not executed in the presence of Kyle or Van Osten and nobody says either of them had notice of it. Just

when they obtained knowledge of it is not disclosed. Though neither Griffin nor Brast then owned the Dewhurst coal, this 5500 acre option was executed by Brast alone. He then had an option of some sort on it, and, on the same day, assigned a one-half interest therein to Griffin. Three days later, they bought it. Then Brast took over the other tracts and subsequently assigned or conveyed one-half thereof to Griffin. Van Osten says he was anxious to put in all the coal he could, but later became fearful that Baird would not be able to pay for all of it. Evidently this fear does not relate to the date of the option. He knew nothing of Baird at that time. They were then dealing with Wyer only. It relates to the subsequent delivery of coal after acceptance of the option. This is obviously true also of the testimony concerning the trepidation caused by Baird's inability to pay the amount of cash contemplated and to pay some of the purchase money notes at maturity. The option was accepted, Dec. 12, 1905, and then the time for completion was extended to March 25, 1906. Griffin, Kyle and Van Osten executed their first deed, Jan'y 20, 1906, the next, March 20, 1906, another May 21, 1906, and another May 25, 1906. Brast and Griffin conveyed the Dewhurst tract to Baird, Jan'y 25, 1906, only five days after the first conveyance by Griffin, Kyle and Van Osten. No doubt the silver lining began to fade on the failure of Baird to produce the much desired and long hoped for cash when deeds were tendered, and the clouds lowered again on the receipt of notices of the protest of his unsecured notes, some months later. Naturally Kyle then figuratively, "sweat blood" agreeably to his imputed admissions and Griffin's sleep failed him. The truth of the testimony to these admissions of discomfort and gloom is directly in the line of probability. But they were periodical. Optimism and pessimism alternated throughout the greater portion of the operations involved.

The established periods of adversity in which discouragement overtook Kyle and Van Osten detract very much from the probative force of the declarations imputed to them. Though made, as claimed, they do not prove these two men would have objected to the purchase of the tracts in question at the time Griffin joined Brast in taking them over, if they

had possessed all the knowledge and information Griffin had. Wyer was his brother-in-law. He likely knew whether Wyer had a purchaser in view when he took the options. They spent most of the evening of the crucial Dec. 12, 1905, together at a hotel in Clarksburg, while Kyle and Van Osten remained at the office in suspense and comparative ignorance. Wyer, for some reason, did not want to visit the office. He thinks Baird was with him at the hotel that night and no doubt he was. He had, on or about Dec. 1st, given Baird a single option on 10,000 acres to be filled from his two options, one from Griffin, Kyle and Van Osten for 4500 acres and the other from Griffin and Brast for 5,500 acres. Kyle says Griffin and Brast came to his office that evening and he spoke to the latter about putting in the Dewhurst coal, and, on Brast's intimation of willingness to do so, Griffin reminded him of an engagement at the hotel and they immediately left. Both deny this, but it seems to accord with their established disinclination to let Kyle and Van Osten know what was transpiring at the hotel. No reason for Wyer's alleged unwillingness to visit the office is perceived and none has been assigned. His refusal to do so constitutes Griffin's sole justification for remaining at the hotel during the greater part of the evening.

Griffin's alleged invitations to Kyle and Van Osten to join him in the purchase of the coal in question are lacking in specifications of time, place and circumstances, They are general and indefinite. If given, they may have been timed with reference to the moods of his associates. There is no pretense that they were given in December, 1905, or January, 1906, when conditions favored their acceptance. Nor, indeed, are any specific times given. His protestation of lack of a partnership relation, imposing duty to give his associates an opportunity to participate with him in the purchase of these tracts does not harmonize with his tender of the detached Smith tract of 139 acres and some others which he says they declined to accept. Though not contiguous to the Dye, Kyle and Hornor nucleus, they were in the same locality, wherefore he seems to have felt it his duty to offer to put them into the joint undertaking. The Dewhurst land was more directly in the line of the joint effort and more desirable territory,

but he deemed himself under no obligation, at the time of his purchase thereof, to give his associates an opportunity to join in it.

This analysis of the evidence brings the case clearly within the well settled principles declared and applied in *Krebs* v. *Blankenship*, 73 W. Va. 539, 80 S. E. 948, *Thorne* v. *Brown*, 63 W. Va. 603 and *McKinley* v. *Lynch*, 58 W. Va. 44, provided the joint enterprise was not limited to coal actually purchased, and did not extend to or include coal contemplated but not purchased, nor establish a relation of confidence among the parties, imposing duty to make full disclosure of advantageous information and opportunities.

That the purchase and sale of real estate is proper subject matter for a copartnership is not an open question. It is well settled in this state as elsewhere. But it is said there could have been no partnership here, because the members of the association had no power separately and individually to make binding contracts of purchase or sale for and on its behalf. In other words, the connection is that no coal became partnership coal, until after it was bought by the joint and unanimous action of the members, wherefore no duty could have been imposed upon any member, toward his associates respecting any coal not actually purchased; and *Latta* v. *Kilbourn*, 150 U. S. 524 is cited and relied upon as sustaining the proposition. The facts in that case were vitally different from those involved here. Latta was a member of a firm of brokers, not at all engaged in the purchase and sale of real estate on their own account. He engaged with Stearns in some purchases and sales of real estate which the firm handled for them as agents and on which it took its commissions. Afterwards, the other members of the firm endeavored to compel him to account for the profits he had derived from these transactions. In the bill they alleged an agreement among the members of the firm, forbidding any of them from engaging in the business of buying and selling any real estate on their own account or with any other person or persons, without first having explained the proposed transaction to the firm and given it an opportunity to take part in it. This allegation was denied and not established by proof. Nevertheless the court treated

it as having been established, for the purpose of a test of the rights of the parties under it, if it had been. Defining it as being only an agreement to furnish information, the court held it did not enlarge the scope of the partnership. Mr. Justice Jackson, delivering the opinion, said: "It would be a perversion of language and confusion of ideas to treat such a stipulation, if it were established, as creating a partnership in future options to buy what did not already, by the terms of the copartnership, come within the scope and character of the partnership business." He further said the stipulation "at most could only be regarded as an agreement for a future partnership in respect to such properties as might be specially selected for speculation." But all of this must be read in the light of the facts. The firm had never bought and sold any real estate on its own account, and there was no agreement among the members that it should do so. The stipulation set up provided no more than that any member desiring to engage in that business should bring his opportunity or scheme to the attention of the firm to enable it to say whether it desired to take a new line of business, not additional business of the kind in which it was engaged. Prosecution by a member of the firm of a business in which the firm was not at all engaged did not amount to competition with the firm nor work an absraction of any of its profits, actual or potential. It was not in any way inimical to the firm. Here the parties had no business in common other than the purchase and sale of coal. The taking of additional tracts wrought no change in the character of their business nor a departure in any sense. As indicated by their situation and purposes and all the circumstances, their enterprise was limited to a certain locality, rather than to certain purchases. It was not an agreement to buy and sell coal everywhere, but only in and around the territory indicated by the Dye, Kyle and Hornor holdings. Supposing the parties to have agreed among themselves to purchase these and other adjoining tracts, to the extent of their ability to procure and dispose of them at a profit, all such tracts would clearly come within the scope of the agreement and undertaking. Does the imposition of restraint or a limitation upon the agency of each member narrow the scope of the enterprise? Not at all. The

agency is not the partnership, nor the dominant factor in it. It is a mere incident of the relation established by the agreement defining the character and scope of the undertaking, and may be enlarged or diminished according to the judgment or wishes of the parties, without destruction of the partnership relation. *Bates* v. *Forcht,* 89 Mo. 120; *Mining Co.* v. *Laverty,* 159 Pa. St. 287; *Radcliffe* v. *Varner,* 54 Ga. 427; *Frost* v. *Hanford,* 1 E. D. Smith, 540. An agreement to buy and sell on conditions is nevertheless an agreement. The introduction of conditions does not destroy it. If these parties expressly or impliedly agreed to take all of such bodies of coal in a given locality as they should unanimously approve as fit subjects of purchase, the general agreement would clearly embrace all of them. The condition for approval would not affect the scope of the enterprise any more than such a limitation in a copartnership for the handling of live stock, merchandise, securities or any other commodity would affect its scope. It merely determines the method of execution of the scheme. All the tracts would be potentially within the agreement, not within the power of one member, but within the power of all. The scope of the partnership would be determined by the breadth of the general agreement.

The coal in question was obviously in the line of the aims and purposes of the parties. As a whole, it was contiguous to their nucleus and lay between it and the railroad. In such enterprises, an outlet is generally essential. An advantageous sale cannot be made without it. Baird's option affords some evidence of the advantageous connection of these properties, and Wyer took his two options so as to enable him to consolidate the tracts, with access to means of transportation. Whether Baird would have taken the 4823.66 acres without the coal lying between it and the railroad does not appear, but his 10,000 acre option taken so as to include it discloses his view of the situation as a coal dealer, as the action of Brast, Griffin and Wyer in covering all these tracts with two options in the hands of one man indicates theirs. Manifestly their conception of the relation of the tracts, respecting their standing in the market, coincided with that of Kyle and Van Osten, and lends support to Kyle's contention as to the scope of the partnership agreement.

The written memorandum of agreement must be read in the light of all the circumstances, and being so read, it does not define the territorial limits of the enterprise. No express limitation of that kind is found in its terms. Nor are its terms inconsistent with the partnership relation. On the contrary, they disclose some of the elements of that relation, joint burden of costs and expenses and equal division of profits. They impliedly express purpose to sell as well as to buy. In case of a loss, equal contribution to costs and expenses would necessitate equality in loss. As these elements of a copartnership agreement appear in the terms of the instrument, it cannot destroy the force of the extraneous evidence of partnership.

Upon these views and conclusions, we think the finding of the trial court on this issue is right.

The allowance of a commission to Griffin is clearly wrong. He proves no special agreement for compensation. Kyle and Van Osten both positively deny its existence. Aside from the testimony of Griffin and his wife, neither of whom specifies any rate or basis of compensation, the claim is founded upon inferences · and vague expressions of willingness to compensate. Van Osten says the only offer of compensation to Griffin he ever made was a remark that, on Griffin's sale of the coal, he would give him a trip to Atlantic City. There is evidence tending to prove Kyle offered certain persons a one-fourth interest in the holdings, if they would endorse $30,000.00 of the firm's paper, but that was no offer to Griffin. Offers of commission to third persons are established, but these do not inure to Griffin. Willingness to pay commissions to strangers and generally to any person who would make the sale and expressions thereof constitute no evidence of a special agreement to allow a commission to a member of the firm. He stands on a different footing from that of a stranger. *Prima facie* his services belong to the firm and are paid for by his membership. Griffin rendered very generous and efficient service. His ability seems to have been far greater than that of his associates. but no provision was made in the partnership agreement for a larger share of profits to him on that account. All agree they were to bear the expenses and losses

and share the profits equally, and services of members are not regarded as expenses, when all the parties are active.

The decree of Feb'y 16, 1912 will be affirmed, that, of August 13, 1912, reversed and the cause remanded.

*Affirmed in part.   Reversed in part.   Remanded.*